299 P.2d 467

STATE of New Mexico, Plaintiff-Appellee,

v.

Joe Leandro GARCIA, Jr., Defendant-Appellant.

No. 6059.

Supreme Court of New Mexico.

June 20, 1956.

Dean S. Zinn, Frank B. Zinn, Santa Fe, for appellant.

Richard H. Robinson, Atty. Gen., J. A. Smith, Hilario Rubio, Asst. Atty. Gen., Santa Fe, for appellee.

McGHEE, Justice.

The appellant (hereinafter called defendant) was convicted of murder in the second degree for the killing of his first cousin, Leopoldo Adolfo Garcia, following a Saturday night carousal in Espanola, New Mexico, and vicinity.

On Saturday night, June 12, 1954, the defendant, together with the state's principal witness, Gerson Amos Lucero, a minor, and in company with two young girls (one a niece of the defendant), went to a dance in Pojaque, New Mexico. Before going to the dance the deceased was with the party at his home. He rode with the group to Espanola where he got out of the car and the remaining four proceeded to the Adobe Club in Pojaque where they danced for a considerable time. After leaving the dance the girls were returned to their homes in Santa Cruz, New Mexico.

While the defendant, Lucero and the two girls were attending the dance at Pojaque, the deceased met Porfiria Benavidez and Mary Martinez and told them the defendant was out with another girl. After returning the two girls who had attended the Pojaque dance to their homes, the defendant and Lucero returned to Espanola and went to the Swan Club. The defendant entered the club and returned shortly with Porfiria Benavidez and Mary Martinez. The girl Porfiria was quarreling at the defendant for his being out with another girl and the defendant then learned the deceased had told her the news. The defendant, Lucero and the two women then went to a bar in Riverside, New Mexico, where they remained until closing time,

2:00 a. m. · They went to two other bars but found them closed.

At approximately 1:30 a. m., June 13, 1954, two of the town policemen were at Lola's Bar in Espanola when it was closing and there saw the deceased in a drunken condition. They put him in the back seat of a police car and carried him with them while they patrolled the streets of town until 3:00 a. m., when they drove to police headquarters, turned their car over to the Chief of Police and told him before they went off duty that the deceased was in the rear of the car and of his condition. Some thirty minutes or more later the Chief of Police drove to the home of the deceased's father and let deceased out of the car. The deceased stated he would remain at a truck in front of the home until he sobered up more and he would then take off his shoes so his father would not be aroused when deceased went into the house. The deceased was standing at the side of the truck when the Chief of Police left.

Some time thereafter the brother of deceased who was asleep in the house of the father was awakened by a noise at the truck and looked out the window and saw the deceased approaching the house, whereupon a car stopped in front of the house and a voice the brother recognized as belonging to the defendant called the deceased, Leo, to come back and they would get a drink, or words to that effect. The deceased got in the car with the defendant, Lucero and the two girls, Porfiria and Mary, and drove with them to Lola's Bar where it was testified the deceased got out of the car and the defendant drove to a cafe, turned around and came back to where they had left the deceased and parked the car just inside an alley. We will now quote the testimony of Gerson Amos Lucero, reminding the reader that Joe is the defendant and Leo the deceased:

"Q. Then did Leo talk to Joe, or did Joe talk to Leo? A. Joe spoke to him.

"Q. Where was Leo when you got back? A. He was there in front on the sidewalk.

"Q. Will you describe Leo's condition? A. He was drunk.

"Q. And what did Joe say to Leo? A. Joe told Leo 'let's go and take a drink.'

"Q. And then what did they do? A. Joe got off the car and they walked in front of the car, and I guess they drank, and they started to argue.

"Q. And what was the argument about? A. Joe told Leo 'why was he messing into his business.'

"Q. What were his exact words, as close as you can recall? A. Joe told Leo 'cabron, why are you messing up into my business.'

"Q. And what did Leo say? A. 'It is the truth,' he told him 'it is the truth.'

"Q. And what did Joe say? A. 'You want me to fix you with a bunch of blows?'

"Q. And what did Leo say to that? A. 'If you can do so.'

"Q. And then what was said or done? A. They walked a little farther into the alley.

"Q. And then what happened? A. There is where they started fighting.

"Q. And what were you doing? A. I was inside of the car with Maria.

"Q. In the front or back seat? A. I was in the back seat.

"Q. How long did they continue to fight? A. No, I don't know how long they were there.

"Q. Did you watch the fight? A. Not all of it, just part of it.

"Q. Was it dark or light in the alley at that time? A. It was dark but not very dark.

"Q. Could you hear any noise? A. Yes.

"Q. Could you see whether both of them were standing up at all times or not? A. Once I saw them but they were standing up.

"Q. Was that at the beginning? A. Yes.

"Q. And then what happened? A. I guess they continued fighting, I didn't pay much attention.

"Q. What were you doing? A. I was with Maria in the car.

"Q. What were you and Maria doing? A. There we were embraced.

"Q. You were more interested in Mary than the fight? A. Yes, sir.

"Q. And about how long did you continue there until Joe came back, if he did? A. It was about twenty or twenty-five minutes, I believe.

"Q. Now describe the condition of the night at that time, as to whether it was daylight, beginning to be daylight or whether it was still completely dark? A. It was starting daylight.

"Q. Then did the defendant, who we refer to as Joe, whose full name is Jose Leandro Garcia, return to the car? A. Yes, sir.

"Q. Did Leo return with him? A. No, Joe came back by himself, alone.

"Q. Could you see Leo? A. No, I didn't pay any attention that way.

"Q. What did Joe say then when he returned? A. 'We exchanged a lot of blows.'

"Q. Was anything else said? A. Not that I remember."

The defendant, Lucero and the two women then drove up the Chama Valley to the home of the father of one of them where a package was obtained and they then returned to the home of one of the women

where they spent the remainder of the night.

At about 8:00 or 8:30 Sunday morning the witness Vigil saw the deceased in the alley near Lola's Bar. The deceased was bloody, dirty and barefooted. Vigil went for an officer who returned and took deceased to the home of his father. Later that morning the defendant, accompanied by his daughter, the witness Lucero, and others, started on a picnic but went by the house where the deceased had been carried. The brother of deceased was trying to wash the blood and dirt from deceased's body. The defendant went inside the house, observed the deceased and advised that he go to the hospital immediately, saying he was in bad condition. The defendant took the deceased to the hospital and went on to the picnic. The deceased died the following day from the injuries which had been inflicted upon him.

The first point relied upon for a reversal is that the evidence is insufficient to support a conviction of murder in the second degree in that there is no proof of premeditation or intent to kill and that malice may not be implied from the proof.

The defendant states in his brief:

"It would be absolutely illogical and nonsensical to infer from the facts as presented that the defendant had formed an intent to kill the deceased and had undertaken to do so by challenging him to a fist fight."

Let us have a look at the record and consider what was disclosed by the autopsy which Dr. Yordy performed on the body of the deceased, as well as other testimony in the case.

Dr. Merle E. Yordy performed an autopsy on the body of deceased. We quote from his testimony:

"Q. What did you find as a result of performing this autopsy? A. That he died as a result of multiple injuries, the chief of which were as follows: rupture of the large vein called the vena cava at the location where the vein joins with the left kidney with a massive loss of blood internally. Also, a rupture of his small bowel with generalized peritonitis or inflammation of the covering of the bowel.

"Interpreter: What?

"A. Of the intestine. He also had a fracture of the fifth through the tenth ribs on the right side. He also had multiple bruises over the entire body, being most prominent on the right hip, right chest, arm, abdomen and scalp. He also had small minute hemorrhages of the brain covering.

"Q. What effect could those hemorrhages have had on his orientation before he died? A. Well, they are similar in effect to somebody who has been a boxer who is punch drunk so that he, while he is not unconscious,

and while they can talk, yet they lack judgment of finer reasoning, etc.

"Q. Doctor, based upon your experience, do you have an opinion as to what sort of blows or occurrences could cause these injuries that you have described? A. They were caused by some blunt instrument. As to what it was I cannot say. The most likely three would be either a kick with a heavy shoe—(Objection overruled.)

"A. It could also have been caused by a smooth board or stick, like a baseball bat, or could have been a smooth rock or something like that welded in the hand.

"Q. About how many separate injuries did you note on his body? A. They were so multiple—there were between thirty and forty major ones.

"Q. How intense or how much force would have to be applied to cause an injury such as a rupture of the large vein which joins the left kidney? A. It would take a force larger than a man using his fist. It has been done by professional fighters but it is very rare.

"Q. And what about the type of blows that would cause to rupture the intestine like you have testified? A. That does not require—it depends on the circumstances in that situation. If a man is fully conscious, has his

muscles tensed, it would take a terrific force to do it. If he was unconscious, it would not take nearly as great a force.

\* \* \* \* \* \*

"Q. Doctor, based upon your autopsy and examination, will you state what in your opinion was the approximate and efficient cause of the death of Leo Garcia? A. The proximate cause of death was rupture of the vena cava, with extensive internal hemorrhages, the multiple bruises of the brain and the multiple rib fractures. The efficient cause of death was the rupture of the small bowel, the inflammation of the abdomen and the multiple severe bruises and abrasions. I might also add on the proximate cause that shock due to the blood loss and the multiple injuries was actually the major reason he died.

"Q. Doctor, taking all of the injuries together that you have testified about, just how serious were these injuries taken as a whole? A. They were fatal—period."

The defendant had been upbraided by the woman who was evidently his regular girl friend (and who was described as being very pregnant) for being out with another woman earlier. It is evident defendant was angry with the deceased for having told on him. In addition, we have the defendant going to the home of the deceased at 3:30 a. m. or later and inducing the

deceased in his drunken condition to go for another drink. Defendant put or let deceased out at Lola's Bar, went on up the road a distance, turned around and came back to deceased, provoked a fight and inflicted the grievous wounds described. There may be cases in the books where more brutal assaults were committed, but our attention has not been called to them.

There are two rules with reference to intent in these fight cases. The first is that since death is not the natural or probable result of a blow with the hand, it seems that no intent to kill will, under ordinary circumstances, be inferred, although death results from an assault thus committed. See Annotation, 22 A.L.R.2d 857, where the cases in support of the rule are collected. The second rule is that an assault by blows without a weapon may be attended with such circumstances of violence and brutality that an intent to kill may be inferred. The cases supporting that rule are collected in the above annotation at page 861.

Malice raising the grade of a homicide from manslaughter to murder will ordinarily not be inferred from a blow with the fist. See cases collected at page 868 of 22 A.L.R.2d.

There are many cases which hold although the assault from which death resulted was inflicted with hands, fist or feet, yet if defendant used excessive force or was guilty of extreme brutality, malice may be inferred. These cases are collected beginning at page 871 of above annotation. Oliver v. State, 1937, 234 Ala. 460, 175 So. 305; Ray v. State, 1954, 160 Tex.Cr.R. 12, 266 S.W.2d 124.

The defendant used only two witnesses. The first was his daughter who told of the defendant stopping at the home of deceased on Sunday morning and taking him to the hospital. The second was Mary Martinez, the companion of the state's witness, Gerson Amos Lucero, at the time of the fight. She testified the party did not make the last stop at Lola's Bar and that the defendant and deceased did not engage in a fight. She had previously made a written statement to the District Attorney telling a different story. She was so effectively impeached and confused on cross examination that she, for all practical purposes, became a witness for the state and corroborated the material portion of the testimony of Lucero.

█ It hardly seems possible the wounds shown by the autopsy could have been inflicted with hands or feet, or both, but whatever the means used, a consideration of the evidence in this case satisfies us it is sufficient to support a finding of premeditation, intent to kill and malice.

█ The defendant also claims error was committed in submitting the issue of voluntary manslaughter to the jury. He was not convicted of manslaughter and

298

hence may not complain of the instruction. State v. Horton, 1953, 57 N.M. 257, 258 P. 2d 371; State v. Ochoa, 61 N.M. 225, 297 P. 2d 1053.

■ The defendant complains of the refusal of the trial court to give his requested instruction No. 5 reading:

"You are instructed as a matter of law that in the absence of direct proof of the cause of death in a homicide case such as this, if such cause of death can be accounted for upon any reasonable theory other than that of the defendant's guilt, then you should find the defendant not guilty."

As we view the case, there was plenty of proof of the cause of deceased's death, so the instruction was based on a false premise. There was no error in the refusal to give the tendered instruction.

Complaint is also made of the giving of the following instruction on circumstantial evidence:

"20: You are instructed that while you must be convinced of the guilt of the defendant from the evidence beyond a reasonable doubt in order to warrant a conviction, still the proof need not be by direct evidence of persons who saw the offense committed. The acts constituting the crime may be proved by circumstances. And by circumstantial evidence is meant the proof of such facts and circumstances connected with or surrounding the commission of the crime charged, as tend to show the guilt or innocence of the accused. And if such facts and circumstances are sufficient to satisfy the jury of the guilt of the defendant beyond a reasonable doubt, then such evidence is sufficient to authorize the jury in finding a verdict of guilty. But you are instructed that before you would be authorized to find a verdict of guilty against the defendant where the evidence is circumstantial, the facts and circumstances shown in the evidence must be incompatible upon any reasonable hypothesis with the innocence of the defendant and incapable of explanation upon any reasonable hypothesis other than that of the guilt of the defendant."

■ Instruction 20 is an old stock instruction which has been given in this state for many years, and we are unable to follow the defendant in his argument it is confusing and could not be understood by the jurors. The judgment will be affirmed. It is so ordered.

COMPTON, C. J., and LUJAN, SADLER and KIKER, JJ., concur.