THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
CRUZ FIGUEROA GUZMÁN, Defendant and Appellant.

No. 16325. Submitted January 21, 1958.—Decided May 21, 1958.

*Miguel A. Ruiz* for appellant. *J. B. Fernández Badillo, Attorney General, Arturo Estrella, Assistant Attorney General* and *Alfredo Archilla Guenard* and *William Fred Santiago, Fiscal* and *Assistant Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

Cruz Figueroa Guzmán was prosecuted in the Superior Court, Ponce Part, under the following information:

"The Prosecuting Attorney files information against Cruz Figueroa Guzmán, charging that on or about August 20, 1956 and in Juana Díaz, Puerto Rico, within the jurisdiction of the Superior Court of Puerto Rico, Ponce Part, there and then the said defendant unlawfully, wilfully, and criminally, with malice, premeditation, and deliberation, revealing a perverted and malignant heart, and with a firm and deliberate intent to kill illegally a human being, assaulted and attacked Raúl Enrique Torres Muñoz, a human being, with a metal knuckle, which is a contusive weapon, as a result of which the said Raúl Enrique Torres Muñoz received several contusions and fractures, which were the direct cause of his death occurring shortly thereafter."

He was also charged with illegal carrying of weapons. Having been tried jointly by a court without a jury, he was convicted of voluntary manslaughter and sentenced to serve an indeterminate sentence of one to five years in the penitentiary at hard labor. He was acquitted of illegal carrying of weapons.

In his appeal from the judgment of conviction he maintains that "the verdict is not supported by the evidence, which would be sufficient only to support a conviction of involuntary manslaughter." He urges us to reduce the judgment to involuntary manslaughter, alleging that "the facts do not warrant in any manner whatever the inference therefrom of an intent to kill because no weapon was used, and the assailant, after striking the blow with his fist, did not continue striking his victim."

The facts disclosed by the evidence for the prosecution may be summed up as follows:

At midnight of August 19–20, 1956, the defendant, Cruz Figueroa Guzmán, and his friends, Carlos Santiago, Ramón Feliciano, Eladín Reyes, and Antonio Martínez, were returning to Ponce from a country place in Villalba where they attended a party. As they passed by the recreation park of Juana Díaz, Antonio Martínez insulted a woman who was there. The woman complained to the police, and the latter left in a jeep in search of the travelers and overtook them near the municipal cemetery of Juana Díaz. The defendant, Carlos Santiago, and Ramón Feliciano alighted from the bus and the police and Cruz Figueroa Guzmán engaged in a conversation. In the midst of the conversation, Eladín Reyes and Antonio Martínez suddenly started the bus and proceeded on their way to Ponce, being pursued by the police. The defendant and his two friends, in turn, proceeded on foot in the same direction. As the bus rounded at great speed a curve on the road near a bridge, its right door flung open and Antonio Martínez fell out, landing on the road and fracturing an arm. The bus, which was operated by Eladín Reyes, proceeded at great speed without the driver bothering to aid Martínez. Near the place where the latter landed, Gumersindo Burgos, Pedro Hernández Cruz, Jesús Ramón Pagán, and private Ramón Enrique Torres Muñoz were seated on the wall of a bridge, playing a guitar and singing.

When they saw Antonio Martínez fall out, they picked him and tried to help him. Several drivers of automobiles which passed by that place would not stop to carry the injured to a hospital in Ponce, but at last the quartet found someone who was willing to take Martínez to the hospital. As they put him on the car, the defendant Cruz Figueroa Guzmán, Carlos Santiago, and Ramón Feliciano arrived at the place on foot. None of them knew those of the group who helped Martínez. When they were discussing what had happened to the latter, the defendant and Gumersindo Burgos engaged

in an argument and the defendant swung a blow at Burgos; the latter evaded the blow but private Raúl Enrique Torres Muñoz, who was standing behind Burgos, received it on his chest, as a result of which he fell backwards on the pavement of the road fracturing his skull. Four hours later Torres Muñoz died on his way to the army hospital. That same night the defendant surrendered to the Juana Díaz police.

An Army doctor performed the autopsy on the deceased. At the trial, he testified that the body did not present "any sign of having been injured with a metal knuckle or contusive weapon."[1]

The evidence for the defendant, which was not believed by the trial judge, consisted of the testimony of the defendant himself, of Carlos Santiago, and Ramón Feliciano. The latter two walked with him from the Juana Díaz cemetery to the bridge. Their testimony tended to prove that when the defendant and his friends encountered the group where the injured Martínez was, the witness for the prosecution named Gumersindo Burgos passed for a policeman, told the defend-

---

[1] The medical certificate of the autopsy, signed by that physician and which was admitted by the court with the acquiescence of the defendant, states verbatim, among other things:

"General: The body is that of a well-developed, and well-nourished, young, white male, displaying rigor mortis of the jaw, but none of the extremities . . . . There is an abrasion, approximately 2.5 in diameter, over the occipital protuberance . . . . HEAD: The skin over the occipital protuberance reveals the abrasion mentioned earlier in this report . . . . There is a linear fracture running from the posterior portion of the left posterior cranial fossa, through the medial aspect of this fossa, to the left jugular forearm. There is no displacement of any cranial bone evident. No other fractures are found.

"SUMMARY

"This is the case of a young, white male who is said to have been struck on the jaw by the fist of an assailant, and as he fell over backwards he hit his head (posterior portion) on a cement street. He was attended by a physician who sent him to Rodríguez Army Hospital by air, but he expired before his arrival at R. A. H. Death in this case is attributed to head injury which resulted in a massix epidural hemorrhage, subdural hemorrhage, cerebral contusions, and focal subarachnoid hemorrhage. The pulmonary changes are considered to have developed following the injury to his head."

ant that he was under arrest, took the wallet away from him, and slapped his face; that then private Torres Muñoz approached them, grabbed the defendant by the left arm, who at that moment took a punch at Burgos, which landed on the chest of private Torres Muñoz and knocked him down; that when this occurred, the rest attacked the defendant with stones and set him fleeing into a sugar-cane field.

■ Voluntary manslaughter is the unlawful killing of a human being without malice, upon a sudden quarrel, or heat of passion. If unlawful death without malice occurs as a result of an unlawful act not amounting to felony, or of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection, the crime is involuntary manslaughter.[2]

In pronouncing sentence, the trial judge stated, among other things:

". . . the prosecuting attorney . . . has not established that he (the defendant) was carrying any weapon, and the medical certificate does not show that the victim died as a direct result of the attack with a deadly weapon. In the murder case prosecuted by The People against Cruz Figueroa Guzmán, the court is of the opinion that none of the ingredients of the crime of murder in its classical modality of murder is present, nor is there malice. But the court is convinced that Cruz Figueroa Guzmán is guilty of the crime of voluntary manslaughter, and therefore finds him guilty and convicts him of voluntary manslaughter." Tr. Ev. 73.

The basic distinction between voluntary and involuntary manslaughter, as developed by the legal doctrine, consists in that in voluntary manslaughter the intent to kill a human being must be present, while in involuntary manslaughter death is produced without intent to kill.[3]

---

[2] Section 203 of the Penal Code (33 L.P.R.A. § 635) ; *People* v. *Cruz,* 49 P.R.R. 637, 641 (1936) ; *People* v. *López,* 77 P.R.R. 573, 578 (1954).

[3] *People* v. *Cruz,* 49 P.R.R. 637, 641 (1936) ; *People* v. *Cortés,* 42 P.R.R. 886, 887 (1931) ; *Cf. People* v. *Méndez,* 74 P.R.R. 853, 869, 872 (1953) ; *People* v. *Pilgrim,* 73 Cal. App. 2d 391, 166 P. 2d 636 (1946) ; *People* v. *Bender,* 27 Cal. 2d 164, 163 P. 2d 8 (1945) ; *People* v. *Ross,* 34 Cal. App. 2d 574, 93 P. 2d 1019 (1939) ; *People* v. *McManis,* 122 Cal. App. 2d 891,

 Did the evidence offered by the district attorney establish beyond a reasonable doubt that the defendant attacked private Torres Muñoz with his fist, with the intention to kill him? We hold that that evidence was insufficient to so establish.

All the eyewitnesses called by The People testified that the defendant, dissatisfied with the account which Burgos gave him as to what happened to Martínez, swung a blow at Burgos, but as the latter moved to evade the blow it landed on private Torres Muñoz, who was very near Burgos, falling over backwards on the road; that the defendant did not strike another blow on Torres Muñoz but left the place immediately after witness Jesús R. Pagán.

Gumersindo Burgos Santiago, the principal witness for the prosecution, upon being asked why the defendant tried to hit him with his fist, testified: "Perhaps he (the defendant) thought that we injured the fellow we put on the bus." (Tr. Ev. 44.)

The trial judge stated that the defendant did not carry any weapon, or acted with malice, at the time of the assault. The physician testified that the body of Torres Muñoz did not present any sign of having been injured with a metal knuckle or a contusive weapon, and attributed the cause of the death "to a head injury (posterior portion) which resulted in a massix epidural hemorrhage, subdural hemorrhage, cerebral contusions, and focal subarachnoid hemorrhage." However, these circumstances do not point to the fact that the defendant may escape criminal responsibility. The latter does not depend on the fact that the death is the immediate consequence

266 P. 2d 134 (1954); *People* v. *Miller*, 114 Cal. App. 293, 299 Pac. 742 (1931); *People* v. *Kelley*, 24 Cal. App. 54, 140 Pac. 302 (1914); 25 Cal. Jur. 2d, *Homicide*, §§ 125 and 134; 1 Warren on *Homicide* 420, 422; 2 Burdick, *Law of Crime* 200, 201; 1 Wharton's *Criminal Law* 664; Moreland, *Law of Homicide* 64; Clark and Marshal, *A Treatise on the Law of Crime* 354, 5th ed. (1952); 38 Ky. L. Rev., *A Re-examination of the Misdemeanor Manslaughter Doctrine* 118–27; 40 C.J.S., *Homicide*, § 54; 26 Am. Jur., *Homicide*, §§ 18 and 44.

of his behavior, if the assault contributed immediately or mediately to Torres Muñoz's death.[4] Here the appellant does not attempt to elude his criminal responsibility; he accepts it but not in the measure determined by the trial judge. His theory is that the crime which he committed was involuntary manslaughter, because he did not attack Torres Muñoz with the intent to kill him.

We have been unable to find in the evidence for the prosecution any circumstance from which it may be reasonably inferred that the defendant attacked the private with the intent to kill him. To strike a single blow with the fist on the chest of a healthy adult and in ordinary circumstances can not be regarded dangerous or susceptible of producing death or grave corporal injury.[5] The inference of a homicidal intent is justified when a blow with the fists is inflicted brutally, violently, and viciously on a vital and delicate part of the human body; when the assailant takes advantage of the indefenselessness of the victim and of his corpulence over him, and punishes him with extreme cruelty in reckless disregard of the human security, or in such manner that the natural, ordinary, and probable result is the death of the fellow creature injured. In these cases the hands and the feet are classed as a deadly weapon.[6]

Although the blow with the fist knocked down the private, however, according to the physician, there was no sign of injury on Torres Muñoz's chest.

The witnesses for the prosecution, Burgos and Pagán, testified that the defendant, before attacking the first one of them, said *"move away* because one of us was going to die, and that the workhouse or the cemetery meant nothing

---

[4] 26 Am. Jur., *Homicide,* § 48.

[5] *People* v. *Chutuk,* 124 Pac. 566; *People* v. *Bones,* 170 Pac. 166; *Roark* v. *Commonwealth,* 28 S.E. 2d 693; *Kearns* v. *Commonwealth,* 49 S.W. 2d 1009; *Thomas* v. *Commonwealth,* 86 S.W. 694; *People* v. *Hodges,* 85 P. 2d 443; *State* v. *Cobo,* 60 P.2d 952; *Ketring* v. *State,* 200 N.E. 212; *Sikes* v. *Commonwealth,* 200 S.W. 2d 956.

[6] See *Commonwealth* v. *Buzard,* 365 Pa. 511 (1950), and the annotation published in 22 A.L.R. 2d 854–74.

to him, and *pretended to take out something from his pocket . . . ."* Those words, uttered by an unarmed person, perhaps tired from the effects of continued drinking and a long walk, addressed to a group of four other persons who, although also unarmed, could repeal any attack with their fists, were nothing more than a bluff proper to one who boasted of being a prize fighter. They all remained there without paying any attention to the defendant's order to move away. The latter swung his arm to attack Burgos, not private Torres Muñoz.[7] Burgos testified: ". . . and when he took a swing at me I jumped in order to avoid being injured, but the private who was standing next to me . . . did not move." (Tr. Ev. 41.) "I took precautions; the private did not." (Tr. Ev. 46.) The trial judge regarded the defendant's words as a "a bluff." (Tr. Ev. 41.) The defendant's behavior is no positive indication of the mental state which characterizes voluntary manslaughter.[8]

The district attorney's contention in this appeal is that it appears from the circumstances of the case at bar that, not only did the defendant have the specific intent of killing the private, but that he acted with malice and that he should have been convicted of second-degree murder. In support of his theory, he cites in particular the cases of *State* v. *Garcia,* 299 P.2d 467 (1956) ; *State* v. *Sayles,* 155 N. W. 837 (1916) ; and *Boggs* v. *Commonwealth,* 148 S.W. 2d 703 (1941). None of those cases is substantially analogous to the case at bar.

In the *Garcia* case, which originated in the Supreme Court of New Mexico, the defendant was convicted of second-degree murder. In his appeal he maintained that the evidence

---

[7] According to the doctrine of implied intent or transferred intent, which has been the object of much controversy and distinction—1 Wharton, *Criminal Law* 194, footnote 8—we must regard the attack as having been on private Torres Muñoz. Section 51 of the Penal Code, 33 L.P.R.A. § 97; *People* v. *Colón,* 65 P.R.R. 714, 720; *People* v. *Cartagena,* 54 P.R.R. 827, 834; *People* v. *Cabán,* 45 P.R.R. 210; *People* v. *Estrella,* 42 P.R.R. 331; *Caballero* v. *People,* 36 P.R.R. 60, 62; *People* v. *Rivera,* 36 P.R.R. 171.

[8] *Cf. Falero* v. *Calzada, Warden,* 38 P.R.R. 581, 582.

was insufficient to convict him of that offense, alleging that it did not establish premeditation or intent to kill or malice. The pertinent facts of the case were, briefly, as follows: Joe Leandro García, the defendant, was angry at his cousin, Leo García, for messing up into his love affairs. At approximately 3 a. m. of June 13, 1954, Joe invited Leo, who was in a drunken condition, to get in his car and continue carousing. The defendant rebuked his cousin for meddling in his business and provoked him by telling him that he was going to fix him with a bunch of blows. They walked into an alley, and for approximately 20 or 25 minutes the defendant struck his cousin with something which, according to the physician who testified at the trial, could have been a contusive instrument, such as a heavy shoe, a stick, a baseball bat, or a piece of rock. He inflicted about 30 or 40 grave injuries, among them, rupture of the vena cava at the location where the vein joins with the left kidney, the rupture of the small bowel, and the fracture of five ribs. He also caused other bruises on the right hip, right chest, arms, abdomen, and head; also, minute small hemorrhages of the brain covering. The proximate cause of Leo García's death, which occurred a few hours after the brutal assault, was the rupture of the vena cava with extensive internal hemorrhage, the bruises of the brain, and the rib fractures. The efficient cause was the rupture of the small bowel followed by peritonitis.

The Supreme Court of New Mexico held that the facts of the case constituted sufficient evidence to support the finding of premeditation, malice, and intent to take the life of a fellow creature.

In the *Sayles* case, Sayles had threatened to kill the victim, had a fight with him, returned to the place of the quarrel and landed such a strong blow on the victim's larynx that he died from suffocation. The Iowa court held that, from the violence of the stroke and the delicate part of the body on which it was inflicted, there was room for the inference that the de-

326

fendant struck the victim with the intent to kill, with malice aforethought and premeditation.

In the *Boggs* case, the verdict of voluntary manslaughter was upheld because, from the violence with which the only blow received by the victim was inflicted, from the admissions by the defendant after being informed of the death of the person whom he had injured, and having used a steel knuckle to strike the victim on the head—although the evidence on this point was slight—the jury was justified in inferring the existence of homicidal intent.

The controvertible presumption that every person intends the *ordinary* consequence of his own voluntary act,[9] does not apply to the case at bar. Generally, death can not be deemed to be the ordinary, natural, and probable consequence of an assault with the fist on the chest of a young and healthy person. There is no reason to suppose that the assailant contemplated that the act which he was about to commit, or which he did commit, tended to destroy life, or that such a result could be reasonably anticipated.[10]

---

[9] Section 102(3) of the Law of Evidence, 32 L.P.R.A. § 1887.

[10] *People* v. *Crenshaw*, 131 N.E. 577 (1921); *People* v. *Mighell*, 98 N.E. 236. In the sworn statement made by the defendant before District Attorney Veray a few hours after the occurrence, which was offered in evidence by the state, the defendant stated that he swung with his fist in self-defense. (Tr. Ev. 85.) At the trial, when asked if he had swung "the blow . . . with the intent to kill someone," he answered, "in self-defense." (Tr. Ev. 53.)

The most prominent American text writers repudiate, as illogical and harsh, and as having occasioned great uncertainty and confusion in the penal law, the code rule which classifies the crimes of murder and homicide on the basis of whether or not the subordinate unlawful act is a felony or a misdemeanor. They insist that the criminal liability in these cases should rest, not upon the lawfulness or unlawfulness of the act in the course of which the homicide occurred, but upon whether it was sufficiently dangerous in itself to justify a conviction of murder or manslaughter, as the case may be. The unlawful-act doctrine should be grounded on the amount of danger inherent in the act committed, and that it be the proximate cause of the death. They maintain that the test in all such cases should be the usual criterion for criminal negligence: Did the conduct of the accused amount to reckless disregard of human life and safety under the circumstances? Moreland, *The Law of Homicide*, 1952, pp. 183, 192, 194, and 195. *Cf. People* v. *López, supra.*

The appellant, in a sudden, rash, and abrupt impulse, committed an unlawful act by striking the private with his fist, which is an offense of simple assault and battery.[11] But as the unlawful act was aggravated by the unfortunate and unforeseen accidental death of the victim, the ultimate offense committed became one of involuntary manslaughter, as defined by § 203 of our Penal Code. Consequently, the judgment appealed from will be set aside, the defendant is found guilty and convicted of involuntary manslaughter, and the case remanded to the Superior Court, Ponce Part, with instructions to render a new judgment for this offense against the defendant, consistent with this opinion.

---

[11] 33 L.P.R.A. § 821; *People* v. *Bocanegra*, 27 P.R.R. 810.