540 P.2d 1313

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Jessie HERMOSILLO, Defendant-Appellant.**

**No. 1787.**

Court of Appeals of New Mexico.

Sept. 10, 1975.

Chester H. Walter, Jr., Chief Public Defender, Bruce L. Herr, Appellate Defender, Sarah M. Singleton, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Toney Anaya, Atty. Gen., Andrea Buzzard, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

LOPEZ, Judge.

The defendant appeals his conviction for forgery and attempted forgery, § 40A–16–9(B), and § 40A–28–1(C), N.M.S.A.1953 (2d Repl.Vol. 6). We reverse on the basis of one of the claimed errors and do not reach the merits of the others.

The state began its presentation with the testimony of the woman whose checks were forged, Margaret Benavidez. She

testified that she had entered a grocery store, leaving her purse in her car and that when she returned to the car her purse was missing. She suspected three men sitting in a car parked next to hers; she questioned them but declined their offer to let her look in their car. At trial the defendant was identified as one of the men who had been in the car. The record reveals no prosecutions for this theft. Other witnesses for the state included two bank tellers, who said the defendant had driven a car to the drive-in lanes of their respective branches. One witness stated that the woman in the passenger side of the car had handed the defendant a check which he had put in the drawer next to the driver's seat; the other testified to receiving the check in the pneumatic cylinder which the bank used for the distant lanes.

The defendant's main witness was the woman who had been in the passenger side of the car, Ramona Murphy. She is an ex-girl friend of the defendant who was not tried in this case because of a guilty plea in another case. Her testimony was that a Ramon Madrid, who said he had "pulled a job", had given her the checks; that she forged Ms. Benavidez' signature on them; that the defendant knew nothing about the forgeries; that she had handed the checks face down to him when she gave them to him to put into the cylinder and the drawer; that he had not seen the signatures on them; and that she had told him the checks were for welfare and baby-sitting.

The crime of forgery includes " . . . knowingly issuing or transferring a forged writing with intent to injure or defraud." Section 40A–16–9, supra. The jury was also instructed that one could be convicted of the principal crime if one " . . . procures, counsels, aids or abets in its commission and although [one] did not directly commit the crime . . . ." Section 40A–1–14, N.M.S.A.1953 (2d Repl.Vol. 6).

There are apparently two theories on which the defendant could have been found guilty of forgery. The first is that by in-serting the checks into the cylinder he transferred a forged writing. The second is that he procured the checks for Ms. Murphy and helped her get them cashed and therefore was an accessory.

The evidence is insufficient to support a finding that the defendant inserted the checks into the cylinder with the intent to commit a forgery. Ms. Murphy, whose testimony is uncontradicted by direct evidence, testified that the defendant did not know that the checks were forged. The only fact upon which a finding of defendant's guilty knowledge can be based is the defendant's presence in a car next to Ms. Benavidez' at the time that she thinks the checks were stolen. The inference of guilty knowledge from these circumstances requires the inference that the checks were stolen by someone in the car and that the defendant knew that the checks Ms. Murphy later passed to him were the same checks. Thus, it is only by the impermissible device of basing the inference of knowledge on one of these conjectures that the jury could conclude that the defendant knew the checks were bad. See *State v. Peden,* 85 N.M. 363, 512 P.2d 691 (1973); *DeBaca v. Kahn,* 49 N.M. 225, 161 P.2d 630 (1945). The other evidence cited to indicate that the defendant had knowledge that the checks were forged, such as his relationship with Ms. Murphy and his driving her to two different branches of the same bank within three hours, does not form a sufficient basis upon which to rest a conclusion of guilty knowledge. We are aware that "[g]uilty knowledge is rarely susceptible of direct and positive proof and generally can be established only through circumstantial evidence. . . ." *State v. Zarafonetis,* 81 N.M. 674, 472 P.2d 388 (1970). However, this does not remove the obligation we have to examine the evidence to determine whether there was substantial evidence to support a finding of intent. The comparison of this case with another with similar facts is instructive. In *State v. Martinez,* 85 N.M. 198, 510 P.2d 916 (Ct.App.1973), the defendant was

convicted of aiding and abetting a forgery. The defendant had driven a woman to the drive-in window of the bank. The woman identified herself by the name of the woman whose checks were forged. The teller then questioned the defendant as to the identity of the woman. The defendant assured the teller that he knew the woman personally and then endorsed the forged checks. The defendant's intent to defraud was revealed by his misrepresentation of the woman's identity. In the case before us there is no act which is similar to this assertion nor is there any other comparable evidence of the defendant's knowledge.

■ Similar difficulties arise when we trace through the theory that the defendant aided and abetted the commission of the forgery. The fact that the defendant accompanied Ms. Murphy at the time that she cashed the checks is not sufficient to support a finding of aiding and abetting, for "[m]ere presence, of course, and even mental approbation, if unaccompanied by outward manifestation or expression of such approval, is insufficient. . . ." *State v. Ochoa,* 41 N.M. 589, 599, 72 P.2d 609, 615 (1937). Thus the theory that the defendant aided and abetted Ms. Murphy is presumably based on the belief that the defendant procured the checks for Ms. Murphy and helped her cash them. In support of this theory there is evidence that the defendant was in the car next to Ms. Benavidez' at the time she thinks her purse was stolen. There is also a statement of the defendant, repeated at trial by a police officer, that he had been present when Ms. Benavidez questioned the men in the car about the theft of the checks.

■■ All of this evidence that points to the defendant as the one who took the checks and gave them to Ms. Murphy is circumstantial. When all of the evidence which establishes the different elements of a crime is circumstantial (See *State v. Peden,* supra) that evidence " . . . must be incompatible with the innocence of the accused upon any rational theory and incapable of explanation upon any reasonable hypothesis of the defendant's innocence. . . ." *State v. Easterwood,* 68 N.M. 464, 466, 362 P.2d 997–998 (1961).

This rule for the treatment of circumstantial evidence is really nothing more than an application of the substantial evidence rule. *State v. Madrid,* 83 N.M. 603, 495 P.2d 383 (Ct.App.1973). Our concern is whether the evidence is sufficient to allow an inference of the disputed act and intent from it, with special rules of inference imposed on the jury when the evidence is circumstantial. See *State v. Elam,* 86 N.M. 595, 526 P.2d 189 (Ct.App. 1974). In this case we do not think the evidence was sufficient to allow a finding that the defendant aided Ms. Murphy by procuring the checks for her because there are too many other explanations which account for Ms. Murphy's possession of Ms. Benavidez' checks.

In reaching this conclusion the promise that we can be controlled by the myriad of New Mexico cases considering the substantial evidence rule and circumstantial evidence is tenuous. Therefore, we will not review the facts in these cases and draw strained comparisons but will rather state that our review of these cases satisfies us that the amount and quality of evidence in this case is far below that found insufficient in several other cases.

The judgment will be reversed and the cause remanded to the district court with instructions to discharge the defendant.

It is so ordered.

SUTIN, J., concurs.

HERNANDEZ, J., dissents.

HERNANDEZ, Judge (dissenting).

I do not agree that there was insufficient evidence to sustain defendant's conviction. I, therefore, respectfully dissent.

I think it necessary for an understanding of my disagreement with the majority to set forth the facts as I glean them from the record.

During the evening of Wednesday, February 20, 1974, Margaret Benavidez had her purse stolen from her car when she momentarily went into a convenience grocery store to make a purchase. Three men were seated in a car parked next to that of Ms. Benavidez. There were no other cars or people in the near vicinity. Upon noticing that her purse was missing, she approached the three men and asked if they had taken her purse which contained, among other things, her drivers license and her check book with several blank checks in it. The men denied having taken the purse and offered to let Ms. Benavidez look around inside their car. She declined.

The next day, February 21, 1974, at about 11:00 a. m., Ramona Murphy accompanied by the defendant, cashed a check ostensibly signed by Ms. Benavidez and written on her check form at a drive up window of the Picacho Street branch of the Farmers and Merchants Bank of Las Cruces. The pass through drawer was on defendant's side of the car. After the check was presented, the teller asked for identification; and Ms. Murphy gave the defendant Ms. Benavidez' driver's license, and he in turn passed it through to the teller.

At about 2:00 p. m. that same day, Ramona Murphy, again accompanied by the defendant, tried to cash another check ostensibly signed by Ms. Benavidez, and also written on her check form, at the Water Street branch of the same bank. The teller had been alerted not to cash any checks drawn on that account. She notified the manager, and he called the police. Defendant and Ms. Murphy were arrested at the scene. Defendant was identified by Ms. Benavidez as one of the three men sitting in the parked car near her own at the time her purse disappeared on the day before.

At trial Ms. Murphy testified in defendant's behalf. She admitted forging three checks: the one cashed during the morning of February 21, at the Picacho Street branch, the one which she was attempting to cash when she and defendant were arrested, and a third which she cashed without defendant. Her testimony was that defendant was not involved in the forgeries. She said she had explained the checks by telling defendant that one check was in payment for some babysitting and that the other was her welfare check.

Ms. Murphy further testified that she had gotten the checks from a person named Ramon Madrid and that he had accompanied her when she cashed the third check. She stated that she had met the defendant on the morning of the 21st and had asked as a favor that he drive her to the bank.

On cross-examination and over objection, Ms. Murphy testified that she had previously lived with the defendant and had borne his child, but that they had been separated for some time before the incidents in question. However, both she and the defendant gave the same home address at the time they were "booked."

Defendant was convicted of one count of forgery, Section 40A–16–9(B), N.M.S.A. 1953 (2d Repl.Vol. 6); and one count of attempted forgery, Section 40A–28–1(C), N.M.S.A.1953 (2d Repl.Vol. 6).

Section 40A–16–9(B), supra, provides: "Forgery consists of: . . . B. knowingly issuing or transferring a forged writing with intent to injure or defraud." This Court in *State v. Tooke,* 81 N.M. 618, 471 P.2d 188 (Ct.App.1970), in construing the terms, "issuing" and "transferring", stated: "Both these terms encompass a delivery to one who is a holder with the passing of interests from one to another." In *State v. Ochoa,* 41 N.M. 589, at 599, 72 P. 2d 609, at 615 (1937), our Supreme Court stated:

"The evidence of aiding and abetting may be as broad and varied as are the means of communicating thought from one individual to another; by acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense or calculated

to make known that commission of an offense already undertaken has the aider's support or approval." [Citation Omitted.]

As can be seen there are three elements to the crime as set forth in Section 40A–16–9(B), supra: (1) the delivery, (2) of a forged writing, with (3) intent to injure or defraud. There was direct evidence by the testimony of the bank tellers that the checks were presented. Ms. Murphy admitted on the stand that she had forged the checks. Proof of the third, or intent element was circumstantial. It was proven, in my opinion, by the reasonable inferences that can be drawn from evidence that defendant accompanied Ms. Murphy to two separate branches of the same bank within three hours time, and presented checks bearing a name other than Ms. Murphy's and a driver's license issued to someone else as proof of her identity. Since the defendant handled the checks and the license he had an opportunity to see the names on the checks and the driver's license. Also to be considered is the past intimate relationship that existed over time between defendant and Ms. Murphy. "Evidence is termed direct which applies immediately to the fact to be proved, without any intervening process . . ." Bouviers Law Dictionary, Rawles' Revision. "'. . . [B]y circumstantial evidence is meant the proof of such facts and circumstances connected with or surrounding the commission of the crime charged, as tend to show the guilt or innocence of the accused.'" *State v. Garcia,* 61 N.M. 291, 299 P.2d 467 (1956). I believe that this evidence is sufficient to establish that defendant aided and abetted Ms. Murphy in the commission of both crimes. Defendant's argument that the jury had to first infer that he had stolen the checks from Ms. Benavidez' car before they could determine that he had aided and abetted her is without merit, in my opinion.

Since I believe that defendant's conviction should be affirmed, I answer his other points of error.

Defendant's second point: that the trial court failed to instruct on the intent necessary to convict him as an accomplice, is without merit.

Section 40A–1–14, N.M.S.A.1953 (2d Repl.Vol. 6), provides:

"A person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission and although he did not directly commit the crime and although the principal who directly committed such crime has not been prosecuted or convicted, or has been convicted of a different crime or degree of crime, or has been acquitted, or is a child under the Children's Code [13–14–1 to 13–14–45]."

Our Supreme Court when called upon to interpret this section had this to say:

"We find nothing in the statute indicating an intent to make one who aids and abets in the commission of a crime a separate offense distinct and different from the crime committed by the one actually perpetrating it. . . . The statute is to be read as though the words 'as an accessory' were omitted." *State v. Nance,* 77 N.M. 39, at 46, 419 P.2d 242, at 247 (1966).

In this regard, the trial court gave the following instructions:

"A person may be charged with and convicted of a crime if he procures, counsels, aides or abets its commission and although he did not directly commit the crime. Every person concerned in the commission of an offense, whether he directly commits the offense or procures, counsels, aides [sic] or abets in its commission, may be indicted or informed against as a principal." [No. 16.]

With reference to the requisite intent, the trial court instructed as follows:

"You are instructed that the intent with which an act is done is a mental process, and as such generally remains hidden within the mind where it was conceived and is seldom, if ever, susceptible of proof by direct evidence, but must be in-

ferred and established by the acts, conduct and doings of the person having such intent, and from the facts and circumstances surrounding such acts, conduct and doings, and in determining the intent with which the defendant in this case committed the act or acts charged in the Indictment, if you find that he did so, it is proper for you to consider his acts, conduct and doings, together with all the other facts and circumstances proved on the trial of this case." [No. 13.]

"You are instructed that the offenses of forgery and attempted forgery are offenses requiring a specific intent, which our courts have defined as follows:

'A person who knowingly does an act which the law forbids or knowingly fails to do an act which the law commands, specifically intending to violate the law or recklessly disregarding the law, acts with specific intent.'

"Specific intent, as the term implies, means more than the general intent to commit the act." [No. 14.]

"You are instructed that forgery consists of knowingly issuing or transferring a forged writing with intent to injure or defraud. A forged writing is a writing made falsely or altered with intent to injure or defraud." [No. 15.]

The trial court correctly instructed the jury as to the element of intent.

Defendant's third point is that the trial court erred in permitting an in-court identification because it was tainted by a pretrial identification which was unnecessarily suggestive and therefore violative of due process.

The day after her purse had been stolen, Ms. Benavidez was notified by the police department that her wallet had been found and that she could pick it up. While she was at the police station, an officer asked her to walk by a given office to see if she recognized any one inside as one of the men she had seen in the car parked next to

her own at the convenience market on the night before. There were three persons in the room. One was later identified to her as Detective Davis. At the time in question, he was not in uniform. One of the remaining two was the defendant. Ms. Benavidez could not remember at the time of trial whether the third person in the room was male or female. Detective Davis was seated behind one of the desks in the room. The third person was seated behind another of the desks, and the defendant was seated alongside. Ms. Benavidez immediately recognized the defendant as one of the persons in the car from the night before.

Defendant's point would have merit had he been charged with larceny of Ms. Benavidez' purse. I agree that the circumstances of this identification were highly suggestive. Nevertheless, one cannot ignore that defendant was unequivocally identified by both bank tellers and that following his arrest, he admitted to one of the police officers that he had been at the convenience grocery store on the previous evening when Ms. Benavidez' purse disappeared. Given these circumstances, permitting defendant's in-court identification as one of the persons present at the convenience store incident by Ms. Benavidez was harmless error.

Defendant's fourth point is that the trial court erred in allowing the State to impeach Ramona Murphy on cross-examination.

The pertinent questions and answers were the following:

"Q. Isn't it true that both you and Jessie gave your residences as 220 Willow?

"A. Uh huh.

"Q. And you had lived with Jessie at that residence, had you not?"

At this point defense counsel asked that the jury be excused so that he could make an objection. The trial court stated that wouldn't be necessary because it was going

to overrule his objection and allow questions concerning where and with whom she lived. The district attorney then resumed his cross-examination.

"MR. WILLIAMS: The two of you gave the same address, isn't that right?

"A. Yes, sir.

"Q. And you were very close to Jessie Hermosillo, weren't you?

"A. Not at the time, we were having our difficulties, our problems, and we weren't together.

.    .    .    .    .    .

"Q. How long had it been since you had been very close to Jessie, prior to the date that this all happened?

"A. Oh, let's see, he got out of the penitentiary in January, I was with him for a while, around, oh, I would say, the last of February, beginning of March, we just quit.

"Q. Okay, what do you mean, you quit?

"A. Just didn't see each other."

Thereupon, defense counsel renewed his request for a record of his objections to the prosecution's cross-examination of Ms. Murphy, and the trial court excused the jury for that purpose.

Defense counsel moved for a mistrial on the ground that the State had brought out the fact that defendant had been imprisoned and on the additional ground that the prosecution had injected evidence as to defendant's character by eliciting testimony that Ramona Murphy had lived with him. His argument was that:

" . . . Rule 608, may it please the Court, says that evidence of character of the witness that affects truthfulness of her character is admissible, but the evidence that she's been living with this man, or that she's had an illegitimate child by him, has no bearing whatsoever on the truthfulness or untruthfulness.

The evidence of a crime, comes under Rule 609, but that doesn't, I think, entitle the District Attorney to go into acts of misconduct that will affect the character of this Defendant, because that is not an issue before the Court at this time."

The trial court denied the motion for a mistrial and overruled the objection to Ms. Murphy's testimony on the common law relationship that had existed between herself and the defendant. The district attorney continued his cross-examination, as follows:

"Q. And you say that you and Jessie broke off whatever relationship you had the last of February or the first of March, is that correct?

"A. Yes, sir.

"Q. And you are relatively sure about that?

"A. Yes, sir.

"Q. Can you give me an approximate date, as to when you broke off your relationship?

"A. No, sir.

"Q. Well, do you know with regard to the 28th of February, the last day of February, was it within anytime, or can you give me—Was it within two days or five days of the beginning of February, or ten days?

"A. I think it was before the 28th.

"Q. How long before?

"A. I would say about a week or two.

"Q. All right. Okay, and this relationship that you and Jessie had, you were living together as man and wife, isn't that correct?

"A. Yes, sir.

"Q. As a matter of fact, you have a child by Jessie, correct?

"A. Yes, sir."

Defendant cites our rule of evidence numbered 608, § 20–4–608, N.M.S.A.1953 (Repl.Vol. 4, Supp.1973), which provides:

"(a) *Opinion and reputation evidence of character.* The credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

"(b) *Specific instances of conduct.* Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609 [20–4–609], may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness himself or on cross-examination of a witness who testifies to his character for truthfulness or untruthfulness.

"The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility."

In his brief defendant argues that this rule is applicable in this situation and that it "limits the ability of a party to attack the credibility of a witness by character evidence only if such evidence relates to truthfulness . . . [and that] specific instances of misconduct must be related to truthfulness to be admissible even if such evidence is introduced through cross-examination of the witness being attacked."

Defendant is mistaken. The applicable Rule is 607, § 20–4–607, N.M.S.A.1953 (Repl.Vol. 4, Supp.1973), which provides: "The credibility of a witness may be attacked by any party, including the party calling him." It has long been established in New Mexico that the possible bias of a witness may be brought out by inquiry into any relationship that might exist between the witness and the parties.

"It is clearly competent on cross-examination to show the relationship existing between the witness and the parties to the case, the friendship or enmity existing between the witness and the parties, and any other fact that will enable the jury to determine whether the witness has any motive for suppressing or discoloring the truth." *Henderson v. Dreyfus,* 26 N.M. 541, at 569, 191 P. 442, at 453 (1919); see, *State v. Talamante,* 50 N. M. 6, 165 P.2d 812 (1946).

I am impressed with the articulation of the basis for this rule of evidence by William G. Hale, *Emeritus* Dean of the law school at the University of Southern California:

"It is accepted doctrine that the bias of a witness will affect his credibility. The existence of bias does not necessarily imply conscious falsehood. It is quite likely however to shade at least, though unwittingly, a witness' testimony, the bias may be in favor of one side or against the other. Granted its existence it may be appropriately taken into consideration in weighing the testimony.

"Since bias is a state of mind, its existence can be determined only circumstantially. These circumstances may consist of relationships (e. g. that [the] witness is the father of the plaintiff) or dealings or encounters calculated to develop a prejudice (e. g. a fight with the party against whom the testimony is given) or conduct, or utterances." 1 Hastings Journal 1 (1950).

Similarly, Wigmore in his treatise on Evidence (Chadbourne Revision 1970), Vol. III A, § 949, p. 784, indicates the kinds of circumstances that may be relevant to show the bias of a witness:

"Among the commoner sorts of circumstances are all those involving some *inti-*

*mate family relationship* to one of the *parties* by blood or marriage or illicit intercourse, or some such relationship to a person, *other than a party,* who is involved on one or the other side of the litigation, or is otherwise prejudiced for or against one of the parties. The relation of *employment* present or past, by one of the parties, is also usually relevant." [Emphasis in the original.] [Footnotes Omitted.]

Showing the bias of a witness is only one of the several ways of attacking credibility.

"There are five main lines of attack upon the credibility of a witness. The first, and probably the most effective and most frequently employed, is an attack by proof that the witness on a previous occasion has made statements inconsistent with his present testimony. The second is an attack by a showing that the witness is biased on account of emotional influences such as kinship for one party or hostility to another, or motives of pecuniary interest, whether legitimate or corrupt. The third is an attack upon the character of the witness. The fourth is an attack by showing a defect of capacity in the witness to observe, remember or recount the matters testified about. The fifth is proof by other witnesses that material facts are otherwise than as testified to by the witness under attack." [Footnotes Omitted.] McCormick, Evidence, § 33, p. 66 (2d Ed. 1972).

Compare,

"The character of a witness for truthfulness or mendacity is relevant circumstantial evidence on the question of the truth of particular testimony of the witness." McCormick, supra, § 41, p. 81.

The challenged questions propounded by the district attorney at trial went to the question of Ramona Murphy's possible bias, not to the question of her truthfulness or untruthfulness; and the trial court did not err in permitting them.