IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-028

Filing Date: May 26, 2009

Docket No. 30,741

STATE OF NEW MEXICO,

        Plaintiff-Appellee,

v.

ROBERT MACIAS,

        Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY
Joe Parker, District Judge

Klipstine, Fredlund & Bowling, L.L.C.
James W. Klipstine, Jr.
Hobbs, NM

for Appellant

Gary K. King, Attorney General
Ralph E. Trujillo, Assistant Attorney General
Santa Fe, NM

for Appellee

OPINION

CHÁVEZ, Chief Justice.

{1}     Defendant Robert Macias was convicted of first degree murder (willful and deliberate) and shooting at a motor vehicle resulting in great bodily harm. He appealed to this Court, claiming, among other things, that "[t]he trial court admitted . . . out-of-court statements contained in recorded calls when there was no foundation establishing any exception to the [hearsay] rule[s] of exclusion." Because we conclude that the trial court erred in admitting the hearsay statements and that the error was not harmless, we vacate Defendant's convictions and remand for a new trial.

1

**BACKGROUND**

**{2}** In the early morning hours of January 15, 2006, police discovered the body of Wilfred Salas, Jr. in his crashed car while responding to reports of gunshots and a car accident. A medical investigator testified at trial that Salas had been killed by a single gunshot to the head. Defendant was charged in the alternative with first degree willful and deliberate murder or felony murder, contrary to NMSA 1978, Sections 30-2-1(A)(1) and (2) (1994), respectively, and shooting at a motor vehicle resulting in great bodily harm, contrary to NMSA 1978, Section 30-3-8(B) (1993).

**{3}** At trial, the District Attorney introduced a number of recorded phone calls placed by various inmates at the Curry County Jail. Among them was a call placed on January 15, 2006 at 2:35 p.m. from Eric Gutierrez, then incarcerated at the Curry County Jail, to his cousin, Jessica Gutierrez. The State does not contend that either Eric or Jessica witnessed or were involved in the shooting. The State introduced the transcript of their phone call into evidence because it contains several statements by Jessica incriminating Defendant. The admission of these statements into evidence is the focus of Defendant's hearsay argument.

**{4}** The January 15 phone call was first brought before the jury during Eric's direct examination by the District Attorney. Jessica had not yet testified. After briefly establishing that Eric was acquainted with Defendant and Jessica, the District Attorney asked Eric whether he recalled making a call to Jessica "on January 15, 2006 at 2:29 p.m." When Eric denied any recollection of the phone call, the District Attorney marked the CD recording of the call as State's Exhibit 90 and prepared to distribute a transcript to the jury. Defendant's attorney objected that the call contained inadmissible hearsay. In sidebar, the attorneys argued over whether the call fell under the business records exception. The judge interjected:

> Here's what I think I need to have. I think I need to have you ask this witness if he has recollection, if he has recall about what the topic would have been. And then he says no. That's the position, then you would say if I share with you this paragraph of this transcript, would you remember? And then you play the recording if he doesn't concede to it.

**{5}** Defendant's attorney continued to object to the use of the transcript of the entire phone conversation, and the District Attorney insisted that he did not intend to offer the transcript into evidence. Despite defense counsel's ongoing concerns, the judge ruled that the District Attorney would be allowed to play the CD if the witness denied having memory of the call and also allowed the transcript to be put before the jury. The judge allowed Defendant to make a record and then terminated the sidebar. The District Attorney continued:

> District Attorney: Mr. Gutierrez, as I mentioned, do you recall the telephone call on January 15, 2006, at 2:35 pm?

Eric Gutierrez: No.

District Attorney: Would it assist you if we played the phone call?

Eric Gutierrez: I mean, I don't remember how it would assist me, but I don't know how it would assist me.

District Attorney: If you heard the telephone call, would your memory be refreshed?

Eric Gutierrez: As in--well actually, I heard it the other day on Sunday when you all played it for me.

District Attorney: And then who called you?

Eric Gutierrez: Jessica I think was calling me at that time.

District Attorney: And do you recall what you first said?

Eric Gutierrez: Something about a football game--I don't remember, I think.

District Attorney: Your honor, may I use, as we discussed this to refresh recollection?

Judge: You may.

**{6}**     At this point, transcripts of the phone call were distributed to the jury.  The District Attorney then began playing the phone call and Defendant's attorney quickly interrupted:

Defense attorney: [inaudible] play the entire telephone conversation?

Judge: I'm supposing he's got it cued to a spot where you're going to have something that is going to remind you of that or remind this gentleman of that phone call?

District Attorney: Your honor, I could stop every sentence, and ask him if he remembers what he said next, or as we've discussed, I could just, I could play the phone call in its entirety, which is approximately two minutes, two and a half minutes.

Defense attorney: Judge, I thought the court had ruled that--

Judge: I'm going to try this one call at two minutes--let's try this one call.

3

**{7}** The District Attorney proceeded to play the entire phone call between Eric and Jessica. During the call, Jessica informed Eric that police had just arrived across the street to arrest Defendant for killing the victim the night before.[1] The following exchange took place early in the call:

> Eric Gutierrez: [Inaudible] who would have shot him, they don't know?
>
> Jessica [Gutierrez]: Yeah, they know, that's, they're here for, looking for him.
>
> Eric Gutierrez: They think it was him, or what?
>
> Jessica [Gutierrez]: Uh, it was, well, yeah, it was.
>
> Eric Gutierrez: Uh uh?
>
> Jessica [Gutierrez]: Mmm hmm.
>
> Eric Gutierrez: Who told?
>
> Jessica [Gutierrez]: I don't know. (same time) This is just last night.
>
> Eric Gutierrez: (same time) Verga.
>
> Jessica [Gutierrez]: Cause he called me like at two o'clock this morning and, and I talked to him right quick and he scared me so I got that one thing, remember that thing you, that you had put away?

**{8}** The call proceeded with Jessica explaining her understanding of the events that led to the shooting, including the following passages:

> Eric Gutierrez: Where'd he shoot him at, in the head, or what?
>
> Jessica [Gutierrez]: The, I guess in the back. Shot him in the back. In the back of the head. Got him in the back of the head.
>
> Eric Gutierrez: But you know it was him though?
>
> Jessica [Gutierrez]: Yeah.

---

[1]Although Defendant is not named during the call, other testimony made it abundantly clear that Jessica and Eric were discussing Defendant, and the District Attorney made this inference explicit in his closing argument.

4

. . .

Eric Gutierrez: Were there, was there any witnesses?

Jessica [Gutierrez]: Uh, nah, he said that he, he told me that nobody, the only one that was with him was Fat Ass and that Fat Ass was all scared, too.

**{9}** Immediately after the recording was played, the defense attorney moved for a mistrial on the grounds that "this evidence is of such a prejudicial nature that it cannot be stricken from the jury's mind." The judge refused to grant the motion, explaining, "I'm not desirous of granting a mistrial at all, but I'm not going to have any more tapes like that when I had pictured somehow there would be a question, an errant answer, and then an impeachment by the language of the transcript."

**{10}** The District Attorney proceeded, asking Eric, "in the transcript, when you ask, 'they think it was him, or what?' and she said 'well, yes, it was,' and you said 'huh?' Who at that point did you think she was talking about?" Eric again explained that he did not recall the conversation. A few minutes later, the District Attorney asked, "When you ask sir, 'were there, was there any witnesses?' and she said, 'uh, nah, he said that he, he told me that nobody, the only one that was with him was Fat Ass and that Fat Ass was all scared, too.' And who is that?" Again, Eric did not remember.

**{11}** Later in his examination of Eric, the District Attorney, while responding to additional hearsay objections to different phone calls, explained his general outlook on the use of the phone calls:

As damning as they may be, [the phone calls] speak the truth. These phone calls speak the truth. Okay. To play them--that's why we're asking. All these people on here testified or are testifying. It's not an out-of-court statement. We offer that there's an exception to hearsay-- this is several things--present sense impression, many times excited utterance, there's recorded recollections, record of regularly conducted activity. There's five exceptions in the first--three exceptions in the first five minutes . . . .

The judge allowed the questioning to proceed and gave Defendant's attorney a continuing objection to the use of hearsay.

**{12}** On the next day of trial, the State called Jessica, the other party to the phone call. A few minutes into his examination, after eliciting testimony that Jessica was in a relationship with Defendant and had received a call from him on the night of the shooting, the District Attorney asked Jessica if she recalled other telephone conversations made around that time. Although Jessica conceded that it was her voice in the recordings that had been played for her before trial, she denied having any recollection of the content of the conversations. Defendant's attorney interrupted: "Judge, so the record is clear, we have continuing

objection as raised earlier in this proceeding to the introduction of hearsay statements made out of court." The objection was noted and the direct examination continued:

District Attorney: Do you recall Mr. Gutierrez--Eric--your cousin, saying, "who would have shot him, they don't know," and you said, "yeah, they know, that's, they're here for, looking for him," and Mr. Gutierrez saying, "they think it was him, or what?" and you said, "uh, yeah, well, it was."

Jessica Gutierrez: I was--I mean--I remember what they were telling him across the street, because you could hear them right then and there because that's right across the street. You could hear everything they were saying to him when they were talking to him.

District Attorney: You mean, you're saying under testimony today that you could hear the police officers talking to the defendant during the phone conversation?

Jessica Gutierrez: Right--they were right across the street outside--they weren't inside the house, they were outside in the front yard.

. . .

District Attorney [returning to the 3:35 p.m. phone call after a brief digression]: He says "they think it was him, or what?" and you said "uh, yeah, well, it was."

Jessica Gutierrez: I don't remember--like I said, I don't remember the phone calls. There was plenty of phone calls.

. . .

District Attorney: Do you recall Mr. Gutierrez saying, "where'd they shoot him, in the head, or what?" Do you recall your response to him?

Jessica Gutierrez: No. I'm telling you, I don't remember the conversation.

District Attorney: Do you recall saying, "I guess in the back. They shot him in, he shot him in the back. In the back of the head. Got him in the back of the head." Mr. Gutierrez says, "but you know it was him, though?" and you said "yeah." Do you recall that?

[Silence]

District Attorney: Do you recall Mr. Gutierrez asking if there was any

6

witnesses?

Jessica Gutierrez: No.

District Attorney: Do you recall your response to say, "uh nah, well he said that he, he told me that nobody, the only one that was with him was Fat Ass, and that Fat Ass was all scared, too."

Jessica Gutierrez: No, I don't remember the conversation.

**{13}** After Jessica's cross-examination, the District Attorney moved for the admission of the recording of the call and requested that he be allowed to play it again on re-direct. He argued that the call was admissible because "[t]he two parties have both already testified about the phone call, they've both been subject to cross-examination. It was recorded from the jail in the normal course of business. It defeats every, every hearsay objection . . . ." Defendant's attorney objected that the statements had already come in and that there was no reason to send the recording to the jury, since it was "potentially prejudicial [inaudible] evidence that he apparently did not examine the witness on. And if he wants to, on re-direct, examine the witness about additional statements made in the conversation, he's open to do that. But there's no reason to introduce the tape itself." The judge admitted the call but would not allow it to be played on re-direct.

**{14}** Having moved the recording of the call into evidence, the District Attorney played it in its entirety during his closing argument. He reminded the jury that they would have the CD during their deliberations. In fact, during deliberations a few hours later, the jury specifically requested a CD player to listen to the call, couldn't find one, and eventually settled on using the transcript instead.

**{15}** Defendant now argues that the trial court erred in admitting the CD and transcript of the telephone calls into evidence. We agree.

**STANDARD OF REVIEW**

**{16}** We review claims that a trial court erred in admitting evidence for abuse of discretion. *State v. McClaugherty*, 2003-NMSC-006, ¶ 17, 133 N.M. 459, 64 P.3d 486. "A trial court abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *State v. Lente*, 2005-NMCA-111, ¶ 3, 138 N.M. 312, 119 P.3d 737.

**THE COURT ERRED IN ADMITTING THE HEARSAY STATEMENTS IN THE RECORDED PHONE CALLS**

**{17}** The recording and transcript of the telephone conversation between Eric and Jessica were admitted into evidence without limitation and despite Defendant's hearsay objection. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial

or hearing, offered in evidence to prove the truth of the matter asserted." Rule 11-801(C) NMRA. Hearsay is not admissible except pursuant to an explicit exception in our court rules or by statute. Rule 11-802 NMRA. Thus, we must determine whether any statements in the phone call were hearsay, and if so, whether they fell under any exception to the hearsay rule. The trial record does not clearly reveal the trial court's specific reason for admitting the statements, but we may uphold the judge's decision if it was right for any reason. *State v. Boyett*, 2008-NMSC-030, ¶ 25, 144 N.M. 184, 185 P.3d 355.

{18}    For the purposes of our discussion, we focus on those out-of-court statements by Jessica that had the potential to incriminate Defendant:

> "Uh, it was, well, yeah, it was [Defendant who shot the victim]."
> "The, I guess [Defendant shot the victim] in the back. Shot him in the back. In the back of the head. Got him in the back of the head."
>
> "Uh, nah, [Defendant] said that he, he told me that nobody, the only one that was with him [at the time of the shooting] was Fat Ass and that Fat Ass was all scared, too."

{19}    Each of these statements was made out of court. The District Attorney insisted at trial that the phone calls "speak the truth" and should be admitted for that reason. Nevertheless, on appeal the State argues that the statements were not admitted for truth, but for the purposes of impeachment or to refresh the witnesses' memory. Neither explanation is plausible, and even if they were, neither the CD nor the transcript should have been provided to the jury during its deliberations for use as substantive evidence.

{20}    With respect to the State's claim that the phone call was used as impeachment evidence, it is generally true that a witness's prior inconsistent statements may be used to cast doubt on the witness's credibility. Rules 11-607, 11-613 NMRA; *see also State v. Hermosillo*, 88 N.M. 424, 432, 540 P.2d 1313, 1321 (Ct. App. 1975) (noting that the credibility of a witness is subject to "an attack by proof that the witness on a previous occasion has made statements inconsistent with his present testimony." (Hernández, J., dissenting) (internal quotation marks and citation omitted)). When impeaching with prior inconsistent statements not made under oath, it is the fact of the inconsistency that is admissible, not the substantive truth or falsity of the prior statement. *See* 3A John Henry Wigmore, *Evidence in Trials at Common Law* § 1017, at 993 (James H. Chadbourn rev. 1970) ("We place [the witness's] contradictory statements side by side, and, as both cannot be correct, we realize that in at least one of the two he must have spoken erroneously. Thus, we have detected him in one specific error, from which may be inferred a capacity to make other errors."); Rule 11-801(D)(1)(a) (providing an exclusion from the definition of hearsay, not relevant to this case, which allows the admission as substantive evidence of a witness's prior inconsistent statements given under oath at a trial, hearing, or other proceeding, or in a deposition). To accomplish impeachment by prior inconsistent statements, the attorney must first elicit in-court testimony about a matter. If the testimony is inconsistent with a

8

witness's prior statement, the attorney confronts the witness with the prior statement. The attorney must provide the witness with "an opportunity to explain and the opposite party an opportunity to examine on the statement," although not necessarily with any "specification of any particular time or sequence" of the statement. *State v. Dominguez*, 2007-NMSC-060, ¶ 18, 142 N.M. 811, 171 P.3d 750 (internal quotation marks and citations omitted); *see also* Rule 11-613(B) (making admission of extrinsic evidence of prior inconsistent statements contingent upon the witness having an opportunity to explain the statements).

**{21}** The use of the taped phone conversation during the District Attorney's direct examination of Eric was not for impeachment purposes. The District Attorney began this area of questioning by asking Eric whether he remembered calling Jessica on January 15, 2006. After Eric testified that he did not remember the telephone call and was uncertain what was discussed, the District Attorney distributed a transcript to the jury and played the recording of the phone call in its entirety. The District Attorney then proceeded to have Eric attempt to interpret the meaning of Jessica's statements. The District Attorney simply was not impeaching Eric with a prior inconsistent statement, because Eric had not made a statement in his testimony that could be impeached by the statements made in the call.[2] *See State v. Spadafore*, 220 S.E.2d 655, 656 (W. Va. 1975) (syllabus by the court) ("Prior out-of-court statements may be used to impeach the credibility of a witness and a prior inconsistent statement may be introduced concerning any specific matter about which the witness has testified at trial; however, where the witness does not testify contrary to his prior statement but demonstrates an absence of memory, such prior statement must be used sparingly to demonstrate lack of integrity in the witness or the reason for surprise to the party which calls him, but these legitimate purposes may not be used as a ruse for introducing inadmissible evidence."). Neither could the statements be used to impeach Jessica, who had not yet testified when Eric took the stand. In any case, even if impeachment were proper, the introduction of the entire call with its myriad hearsay statements would plainly be an inappropriate undertaking, unless the hearsay itself were admissible. *See McClaugherty*, 2003-NMSC-006, ¶ 27 (finding error where "[t]he statements that were used by the State did not serve only to impeach; they offered an admission by Defendant on an issue that was highly disputed at trial[,]" but the admission was inadmissible.).

**{22}** The approach taken with Jessica was virtually identical to that taken with Eric. The District Attorney's direct examination concerning the call began with general questions regarding whether Jessica remembered her telephone conversations in the days following the shooting. Jessica indicated that she did not recall the content of the conversations. The District Attorney then read from a transcript of the January 15 phone call, asking Jessica if she recalled the specifics of the conversation. As with Eric, the District Attorney's questioning cannot fairly be characterized as an impeachment of the witness with a prior statement. In any event, the recording and transcript of statements used to impeach should

---

[2]In fact, in his response just preceding the introduction of the call, Eric *correctly* testified that the phone conversation began with a discussion about a football game.

not have been admitted as an exhibit for use by the jury as substantive evidence. *See Armijo,* 2005-NMCA-010, ¶ 9 ("[A] prior inconsistent statement not under oath is inadmissible as substantive evidence" (citing *State v. Gutierrez*, 1998-NMCA-172, ¶ 10, 126 N.M. 366, 969 P.2d 970 (internal quotation marks and citation omitted))); Rule 11-801(D)(1)(a) (allowing the admission as substantive evidence of prior inconsistent statements made under oath in a prior proceeding).

**{23}** Similarly, despite the State's superficial attempts to disguise its actions as refreshing the recollection of the witnesses, the playing and reading of the recorded conversations before the jury and the admission of the CD and transcript of the phone call exceeded the limited activities allowed by our Rules of Evidence. *See* Rule 11-612 NMRA. Although witnesses are expected to testify in their own words, there are times when a witness does not have perfect recall. In order to refresh a witness's recollection with an exhibit, the attorney must first establish that the witness does not recall the matter. *State v. Bazan*, 90 N.M. 209, 212, 561 P.2d 482, 485 (Ct. App. 1977) ("No means of arousing recollection may be used until the witness has satisfied the trial judge that he lacks effective present recollection . . . ." (internal quotation marks and citation omitted)); *see generally* Kenneth S. Broun, *McCormick on Evidence* § 9, at 37-43 (6th ed. 2006) (describing the process of refreshing recollection).

**{24}** Next, the attorney must determine that the witness's memory will be refreshed by reference to a certain exhibit. If the witness does not agree that the exhibit will be helpful, then the attorney may not attempt to refresh the witness's memory by calling the witness's attention to the exhibit. *See State v. Orona*, 92 N.M. 450, 454, 589 P.2d 1041, 1045 (1979) ("*If the witness acknowledges the statement*, the court may allow the witness to use it to refresh his recollection." (emphasis added)). If the witness testifies that the exhibit might refresh his or her memory, the witness reviews the exhibit without the jury viewing or listening to the exhibit.

**{25}** Although "a song, a scent, a photograph, all allusion, even a past statement known to be false" may be used to refresh a witness's recollection, *Bazan*, 90 N.M. at 212, 561 P.2d at 485 (internal quotation marks and citation omitted), we believe that the refreshing of recollection must be conducted, as under the federal rules, "to prevent inadmissible evidence from being suggested to the jury by any means, such as . . . asking questions in the hearing of the jury." Broun, *supra*, § 9 at 38 n.7. After the witness has considered the exhibit, the attorney must then ask the witness whether his or her memory has been refreshed. If the answer is yes, the exhibit is removed from the witness and the witness continues with his or her testimony. *See* 3 Wigmore, *supra*, § 758, at 125 ("[I]f an actual present recollection results, of the quality sufficient for testimony, the process and the result are legitimate." (internal citation omitted)). The testimony must come from the witness's restored memory, not from the exhibit, and certainly not from the questioning attorney. *Orona*, 92 N.M. at 455, 589 P.2d at 1046 ("[I]f a party can offer a previously given statement to substitute for a witness's testimony under the guise of 'refreshing recollection,' the whole adversary system of trial must be revised. The evil of this practice hardly merits discussion." (internal

quotation marks and citation omitted)).

**{26}** In this case, the witnesses never acknowledged that the recording or transcript would refresh their recollections. Moreover, instead of providing the recording and transcription to the witnesses outside the presence of the jury, the District Attorney, with the trial court's permission, conveyed their content directly to the jury without bothering to determine whether the witnesses' recollections might be refreshed such that they could testify. The allowable procedure for refreshing recollection was simply not followed. Even if it had been, the District Attorney would not have been justified in admitting the CD or transcript as evidence for the jury to consider. *See* Broun, *supra*, § 9 at 42 (noting that "the adversary [may] inspect the memoranda used to refresh memory during the witness's examination, [and] she may also submit them to the jury for their examination. However, the party calling the witness may not do so unless the memoranda constitute independent evidence not barred by the hearsay rule." (Footnotes omitted.)).

**{27}** In the absence of a reasonable explanation of how the statements might have been offered for anything other than the truth of the matter, we must conclude that they were, in fact, admitted for truth. Therefore, because the statements were made out of court and as proof of facts contained in the out-of-court statement, we hold that they constituted hearsay. *See* Rule 11-801(C).

**{28}** Since the statements were hearsay, they were only admissible if they fell within one of the exceptions to the hearsay rule. *See* Rules 11-802, 11-803, 11-804 NMRA. The State suggests that even if the statements were hearsay, they could have fallen under the present sense impression exception, Rule 11-803(A), or the excited utterance exception, Rule 11-803(B). At trial, the District Attorney also suggested that the recordings fell under the business records exception of Rule 11-803(F) or the recorded recollection exception of Rule 11-803(E).

**{29}** We reject these contentions. First, a present sense impression is defined as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 11-803(A). Although it appears undisputed that Jessica was observing Defendant's discussion with police during her phone call with Eric, her hearsay statements concerned the events of the previous night. The State does not suggest, and in any case there is no evidence that would support the assertion, that Jessica perceived the shooting. Her statements were not present sense impressions.

**{30}** Second, an excited utterance is defined in our rules as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 11-803(B). The theory underlying the excited utterance exception is that "the exciting event induced the declarant's surprise, shock, or nervous excitement which temporarily stills capacity for conscious fabrication and makes it unlikely that the speaker would relate other than the truth." *State v. Martinez*, 99 N.M. 48,

11

51, 653 P.2d 879, 882 (Ct. App. 1982). This theory presupposes that the witness was actually present to experience the exciting event; nothing about being in a state of excitement would lead us to believe that a witness is less likely to fabricate information about events of which he or she had no first-hand knowledge. Jessica's most damaging statements concerned the shooting itself, and for this reason, if her statements were to be admitted under the excited utterance exception, she must, at the time of the phone call, have been under the stress of excitement caused by the shooting–not, for instance, by the arrival of police next door. However, once again, there is no suggestion that Jessica was present at the shooting.

**{31}**     The State suggests that Jessica was merely conveying that Defendant "*told her* he shot and killed the victim" (emphasis added) the night before. Setting aside the fact that many of Jessica's statements make no attribution to Defendant at all, this reading would still present insurmountable problems for the excited utterance theory. Although it would clarify that Jessica was excited by Defendant's admissions rather than by the events themselves, it would do nothing to explain how Jessica would still have been so excited, nearly twelve hours after talking to Defendant, that Rule 11-803(B) should apply to her statements. We have held that in order to constitute an excited utterance, "the declaration should be spontaneous, made before there is time for fabrication, and made under the stress of the moment." *State v. Martinez*, 102 N.M. 94, 99, 691 P.2d 887, 892 (Ct. App. 1984). Jessica's statements do not fit this description: far from exhibiting any spontaneity, other hearsay statements in the calls suggest that Jessica was, in part, communicating on behalf of Defendant; the calls were made many hours after the State contends that Jessica was made aware of Defendant's role in the shooting; and finally, the statements concerning the shooting were prefaced by small talk that indicated that the stress of the moment had passed. Thus, these statements were not excited utterances.

**{32}**     Third, we reject the contention that the recorded calls were records of regularly conducted activity under Rule 11-803(F). Under that rule, hearsay is admissible if it is:

> [a] memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time *by, or from information transmitted by, a person with knowledge*, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . *unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.*

Rule 11-803(F) (emphasis added). The justification for this exception is that "[r]eliability is furnished by the fact that regularly kept records typically have a high degree of accuracy. The regularity and continuity of the records are calculated to train the recordkeeper in habits of precision[.]" Broun, *supra*, § 286 at 304. Here, even if the jail was a business and the recordings were regularly conducted business activities, conclusions we need not make,

12

Jessica's statements would clearly fall outside of the rule.

**{33}** Where the hearsay statements to be admitted from a business record come from individuals without personal knowledge who are under no duty to report to the recordkeeper, we cannot hold that the requirements of this exception are met. In *Garcia v. State*, 126 S.W.3d 921, 926-27 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals considered whether a trial court should have admitted statements from the defendant's wife that were contained in a report created by a women's shelter. It concluded that

> [t]he records themselves were admissible, but that does not mean that all information, from whatever source or of whatever reliability, contained within those business records is necessarily admissible. When a business receives information from a person who is outside the business and who has no business duty to report or to report accurately, those statements are not covered by the business records exception. Those statements must independently qualify for admission under their own hearsay exception . . . .

*Id.* (footnotes omitted). We agree with this reasoning. To hold otherwise would be to allow the State to transform completely inadmissible hearsay into admissible evidence simply by routinely recording it.

**{34}** Finally, the transcript was not admissible as a recorded recollection. Under Rule 11-803(E), hearsay may be admitted if it is:

> [a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly.

Neither Eric nor Jessica testified that he or she had made or adopted the recordings when the matter was fresh in his or her memory or that the information in the recordings correctly reflected his or her knowledge, and so the statements do not fall under Rule 11-803(E). *Cf. State v. Allison*, 2000-NMSC-027, ¶ 30, 129 N.M. 566, 11 P.3d 141 ("Because it appears that the witness was denying the information from the tape, the trial court erred in admitting the evidence under Rule 11-803(E).").

**{35}** In addition, Rule 11-803(E) provides that "[i]f admitted, the memorandum or record may be read into evidence *but may not itself be received as an exhibit unless offered by an adverse party*." (Emphasis added.) The State would not have been entitled to admit the statements if they were recorded recollections.

**{36}** In sum, we find that the hearsay exceptions under which the State sought to admit Defendant's testimony are inapplicable. It was an abuse of discretion for the trial court to

13

admit these potentially damaging statements in contravention of our Rules of Evidence.

## THE TRIAL COURT'S ERRORS WERE NOT HARMLESS

**{37}**    Evidence admitted in violation of our hearsay rules is grounds for a new trial only if the error was harmful. *Cf. State v. Downey*, 2008-NMSC-061, ¶ 39, 145 N.M. 232, 195 P.3d 1244. "A reviewing court should only conclude that a non-constitutional error is harmless when there is no reasonable probability the error affected the verdict." *State v. Barr*, 2009-NMSC-__, ¶ 53, __ N.M. __, __ P.2d __ (No. 30,191, May 22, 2009). In contrast, we may find constitutional errors harmless only when there is no reasonable possibility that the error affected the verdict. *See, e.g.*, *State v. Holly*, 2009-NMSC-004, ¶ 28, 145 N.M. 513, 201 P.3d 844. The difference between the applicable standards is not amenable to precise demarcation because harmless error analysis requires an appellate court to review the effect of an error in the unique context of the specific evidence presented at a given trial.

**{38}**    Harmless error analysis, whether under the constitutional or non-constitutional standard, requires us to determine whether an error contributed to the jury's verdict. *See Downey*, 2008-NMSC-061, ¶ 39. However, it is not the role of the appellate court to re-weigh the evidence to decide a defendant's guilt or innocence; to do so would usurp the role of the jury. *See State v. Martinez*, 2008-NMSC-060, ¶ 44, 145 N.M. 220, 195 P.3d 1232. Accordingly, in some circumstances where, in our judgment, the evidence of a defendant's guilt is sufficient even in the absence of the trial court's error, we may still be obliged to reverse the conviction if the jury's verdict appears to have been tainted by error:

> Appellate judges, persuaded by the record that the defendant committed some crime, are often reluctant to open the way to a new trial, given not only the risk of draining judicial resources but also the risk that a guilty defendant may go free. The very reluctance of judges to confront such risks, however, serves to condone errors that may affect a judgment and thus engenders a still more serious risk, the risk of impairing the integrity of appellate review.

Roger J. Traynor, *The Riddle of Harmless Error* 50 (Ohio State Univ. Press 1970).

**{39}**    To decide whether an error by the trial court was harmless, a reviewing court should consider whether there is: "(1) substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear minuscule; and (3) no substantial conflicting evidence to discredit the State's testimony." *Barr,* 2009-NMSC-__, ¶ 56. Weighing these factors, a court must decide if it can conclude with the requisite level of certainty that an error did not contribute to the jury's verdict.

**{40}**    Under the unique facts of this case, we conclude that there is a reasonable probability that the jury's verdict was affected by the erroneously admitted hearsay. In so holding, we

do not minimize the powerful evidence presented at trial of Defendant's guilt. A large number of witnesses, including Defendant, testified that Defendant had been humiliated on the night of the shooting in a fight with friends of the victim. Daniel Garcia testified that the enraged Defendant had overheard his assailants joke about the fight with the victim. Daniel claimed to have been with Defendant as he fired the fatal shot at the victim's vehicle. Through Daniel's testimony, the State was able to introduce recorded phone calls in which Defendant seemed to guide Daniel in disposing of evidence and to threaten Daniel with death should he go to the police. Max Sena and Morris Sharp, although they did not see the shooting, gave testimony consistent with Daniel's story and undermined Defendant's claim to have been asleep at the time of the victim's death. Police investigation of the scene of the crime also supported Daniel's story. There was undoubtedly sufficient evidence to convict Defendant, even if the phone call had not been introduced.

**{41}** Nevertheless, due to the marked emphasis placed by the State on Jessica's hearsay statements and the evidence from the jury itself that the statements were taken into consideration, we cannot hold that the trial court's error was harmless. By our count, the State played or read Jessica's statement that "well, yeah, it was [Defendant who shot the victim]" at least five times during trial, including just before the beginning of jury deliberations. As if to insinuate that Jessica had first-hand personal knowledge that Defendant committed the shooting, this statement went directly to the heart of the case against Defendant. Also played and read repeatedly was Jessica's statement that Defendant had told her that there was only one witness to the crime. In *State v. Alvarez-Lopez*, 2004-NMSC-030, ¶ 34, 136 N.M. 309, 98 P.3d 699 (deciding an issue of constitutional harmless error), this Court agreed with the United States Supreme Court that "[c]onfessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so . . . ." (Internal quotation marks and citation omitted.) We believe that Jessica's statements, because they purported to recount Defendant's confession to her, likely had a similarly profound impact.

**{42}** Even more unusual, from the perspective of a reviewing court searching for evidence that a jury has been affected by error, the jury in this case actually interrupted its deliberations to seek out a means of playing the recorded call. Not having found such a means, the jury later reported that it settled on reviewing a transcript of the call. Although we have no direct insight into the jury's thoughts, in light of this request, we conclude that the other evidence was not so overwhelming that Jessica's statements would necessarily have been minuscule in comparison.

**{43}** Further, although the evidence against Defendant was powerful, Defendant did present his own evidence in opposition to Jessica's hearsay statements. This evidence might have had additional sway with the jury had the error not been made. For example, Defendant presented alibi witnesses and cast doubt on the testimony of Daniel Garcia, who admitted that he had also shot at the victim's car, but claimed that he had used a gun that could not have fired the fatal bullet. Because the jury was not instructed on accessory liability, it had to weigh the evidence and decide whether Defendant himself shot and killed

15

the victim.

**{44}** In the face of this evidence, we are compelled to hold that the trial court's admission of the hearsay statements was not harmless.

**CONCLUSION**

**{45}** The trial court abused its discretion in admitting the hearsay statements of Jessica Gutierrez and the error was not harmless. We vacate Defendant's convictions and remand for a new trial consistent with this opinion.

**{46} IT IS SO ORDERED.**

_____

**EDWARD L. CHÁVEZ, Chief Justice**

**WE CONCUR:**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**CHARLES W. DANIELS, Justice**

**Topic Index for _State v. Macias_, No. 30,741**

**AE**          **APPEAL AND ERROR**

AE-HE          Harmless Error

**EV**          **EVIDENCE**

EV-AE          Admissibility of Evidence
EV-BR          Business Records*
EV-EU          Excited Utterance*
EV-HR          Hearsay Evidence
EV-IM          Impeachment
EV-PI          Present Sense Impression

16

EV-PA          Prior Acts or Statements
EV-RR          Recorded Recollection
EV-TE          Taped Evidence
EV-WM          Writing Used to Refresh Memory