This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: November 7, 2013**

**STATE OF NEW MEXICO**,

    Plaintiff-Appellee,

v.                                        **NO. 33,480**

**LOUIS BENAVIDEZ**,

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Eugenio S. Mathis, District Judge**

Bennett J. Baur, Acting Chief Public Defender
B. Douglas Wood, III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Yvonne Marie Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**VIGIL, Justice.**

{1}     On September 25, 2009, Louis Benavidez (Defendant) drove to the home of Kevin Duran (Victim) with a gun, called Victim outside, and shot him twice, once in the abdomen at point-blank range and once in the back as Victim fled, killing him. A jury convicted Defendant of first-degree murder and tampering with evidence. On appeal, Defendant argues that insufficient evidence supports his convictions and that the district court abused its discretion, both by failing to remedy two instances of alleged jury contamination and by admitting into evidence Victim's statement identifying Defendant as the shooter.

{2}     We affirm Defendant's first-degree murder conviction but hold that Defendant's tampering with evidence conviction must be reversed because it is unsupported by sufficient evidence. Defendant's remaining arguments lack merit. We dispose of Defendant's appeal by this non-precedential decision because settled New Mexico law resolves the issues raised. *See* Rule 12-405(B)(1) NMRA.

**I.     BACKGROUND**

{3}     The following account of the events that occurred before, during, and after the shooting is derived from the evidence presented at trial.

{4}     In September 2009, Victim lived in Las Vegas, New Mexico with his girlfriend Amy and her six children, including her sixteen-year old son Marco. On September 23, 2009, two days before the shooting in this case, Defendant and Marco had a fight

2

after someone alleged that Defendant had stolen property from the house where Victim, Amy, and Marco lived. The fight occurred at the house where Defendant's cousin Adan lived with his wife Colleen, about one block away from Victim's house. Marco gave Defendant a black eye during the confrontation.

{5}     Two days later, on the morning of September 25, 2009, Defendant went to the hospital where his former girlfriend Tammy worked, seeking to resume their romantic relationship. Defendant told Tammy that he had received the black eye in a car accident. Tammy asked Defendant to leave the hospital because she was busy working, and Defendant left. Defendant did not abandon his attempt to reconcile with Tammy, however, and he called her that evening around 7:30 p.m. after she got off work. Tammy agreed to meet with Defendant, and they talked outside Defendant's mother's house for about half an hour before Tammy went home.

{6}     After meeting with Tammy, Defendant went to visit Adan and Colleen, arriving between 8:30 p.m. and 8:45 p.m. Defendant's nephew was there, and he goaded Defendant about the black eye, repeatedly asking, "You gonna let that little punk get away with that?" Defendant pulled a revolver out of a black bag, pointed it at the front door, and walked out of the house, saying he would "be right back." About ten minutes later, Colleen heard gunshots.

{7}     Meanwhile, Victim and Amy were spending the evening of September 25,

3

2009, packing and moving to a new house with the help of Marco and two of his friends when Defendant arrived in his white Chevrolet Cavalier at about 9:00 p.m. Marco, who had been cleaning out his room, saw Defendant's car outside and, anticipating trouble, went to the kitchen and told his mother that Defendant was there.

{8}     At the other end of the house, Amy and Victim also saw Defendant arrive. Victim asked Amy who was outside in the white Cavalier, but at that point Amy did not know. Then Amy heard Defendant say, "Primo, come here," through an open window. Victim responded, "It's my primo, Louie," and he went outside.

{9}     One of Marco's friends observed the exchange between Victim and Defendant from inside the house. He saw Victim walk over to Defendant's car, lean against the frame of the open driver's side window, and talk to the driver and to Defendant, who was seated in the front passenger seat. Suddenly, Defendant reached across the driver and shot Victim. Victim turned away, but Defendant kept shooting as Victim ran up the stairs and back inside the house.

{10}     Consistent with this testimony, the physical evidence at trial demonstrated that Victim was shot twice with pistol ammunition. One bullet entered Victim's abdomen, hit his liver, and exited his right lower back. A wide area of gunpowder stippling surrounding the entry wound indicated that Victim had been shot at close range, from between a few inches to two feet away. A second bullet entered Victim's right upper

4

back, passed through his right lung, and exited his right shoulder, causing fatal injuries. The injuries Victim suffered from this second bullet indicated that Victim may have been shot from behind as he ran, hunched over, away from his attacker, consistent with the account given by Marco's friend who observed the shooting.

{11}    Marco, who had remained inside the house near the front door for about five minutes while Victim was outside talking to Defendant, heard gunfire and saw a flash. Worried that Defendant would come after him next, Marco jumped out a window and hid.

{12}    Amy also heard gunfire and went into the kitchen, arriving as Victim ran back inside. Amy testified at trial that Victim fell into Amy's arms and said, "Babe, help me please. Help me babe. Louie just shot me." Amy was unable to hold Victim up, and he collapsed on the ground.

{13}    Marco saw Defendant's car leave and went back into the house, where he saw Victim laying on the floor, bleeding and unable to talk, with his eyes rolled back and his mouth open. Amy noticed that Victim had stopped breathing, and she called 911, but no one responded. Amy and Marco picked up Victim, carried him to the car, and brought him to the hospital. Medical personnel at the hospital were unable to revive Victim and reported his death to law enforcement at approximately 9:20 p.m.

{14}    After the shooting, Defendant again sought out Tammy, this time at her house

5

in Montezuma, New Mexico, about five miles north of Las Vegas. Defendant arrived at Tammy's house at about 9:30 p.m. and asked Tammy to let him in, telling her, "They just beat me up." Tammy, however, thought that Defendant appeared nervous and "not himself," and she refused to let Defendant in. Speaking through an exterior storm door at her home, Tammy told Defendant, "You look like the [ ] devil's inside of you." Defendant left about five minutes after he arrived. Tammy, feeling afraid, called her co-workers at the hospital but was unable to reach anyone. At 9:43 p.m., Tammy sent the following text message to a friend: "Friend loui showed up @ my house all [messed] up I didnt let him in but I am afraid hell come back thank u for your prayers day I am scared."

{15}     Around 10:20 p.m., a police officer, who had been alerted by radio that a homicide suspect driving a white Cavalier might be traveling toward Albuquerque, spotted Defendant's car heading southbound from Las Vegas on I-25 near milepost 312. The officer followed Defendant's vehicle while waiting for backup to arrive. Defendant continued driving at speeds of up to ninety miles per hour, likely aware that he was being followed by police. Approximately ten minutes later, officers arrested Defendant at milepost 293, about fifty-five miles south of Las Vegas. Police never recovered the gun used in the shooting.

{16}     On December 7, 2009, Defendant was charged by criminal information with an

6

open count of murder and tampering with evidence, along with two other charges that were severed prior to trial and dismissed after trial.

{17} While incarcerated awaiting trial, Defendant spoke to three trial witnesses about the murder. First, on July 27, 2010, Defendant spoke to Victim's brother, who was being held at the same detention center as Defendant, and asked him, "Did you see how I put the hole in your [brother]?"

{18} Then, on May 10, 2011, three weeks before Defendant's trial setting of May 31, 2011, Defendant entered the visiting area of the detention center while his cousin Adan, who was also incarcerated, was speaking with his wife Colleen. Defendant took the phone from Adan and told Colleen, "Hey, the thirty-first is that thing . . . be down." Colleen interpreted this to mean that she should not say anything at the trial that might be detrimental to him.

{19} Finally, Defendant's sister spoke with Defendant on the phone while he was incarcerated, a day or two before she testified on his behalf at trial. Defendant's sister, who lived in Albuquerque, testified that Defendant visited her there "many, many times" and that it was never "too late" for a visit.

{20} Defendant's case was set for jury trial starting May 31, 2011, but the district court was unable to sit a jury and declared a mistrial. Defendant's five-day jury trial ultimately began on November 28, 2011. The jury found Defendant guilty of first-

degree murder and tampering with evidence. The district court sentenced Defendant to a life sentence for the offense of first-degree murder plus three years for the offense of tampering with evidence, to be served consecutively. Defendant appealed directly to this Court. *See* N.M. Const. art. VI, § 2; Rule 12-102(A)(1) NMRA.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

{21}    Defendant's primary argument on appeal is that the State presented insufficient evidence at trial to support his convictions for first-degree murder and tampering with evidence. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). Evidence is substantial if a reasonable mind would accept it "as adequate support for a conclusion." *State v. Flores*, 2010-NMSC-002, ¶ 2, 147 N.M. 542, 226 P.3d 641 (internal quotation marks and citation omitted). In reviewing the sufficiency of the evidence on appeal, this Court "must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). In doing so, we consider whether "a rational jury *could* have found

8

beyond a reasonable doubt the essential facts required for a conviction." *Id.* ¶ 3 (internal quotation marks and citation omitted). When evaluating whether the jury could have found these essential facts, we consider the totality of the circumstances, including the defendant's conduct before, during, and after the commission of an offense. *See id.* ¶¶ 17, 23-24.

### 1. Defendant's First-Degree Murder Conviction Is Supported by Sufficient Evidence

{22}    Defendant argues that the evidence at trial was insufficient to support a first-degree murder conviction. The jury was instructed that, in order to find Defendant guilty of first-degree murder, it had to find that the State proved the following elements beyond a reasonable doubt: (1) Defendant killed Victim, (2) "with the deliberate intention to take away" Victim's life, (3) on or about September 25, 2009. *See* UJI 14-201 NMRA.

{23}    Defendant argues that the State failed to present sufficient evidence to prove that Defendant possessed the requisite intent to commit first-degree murder. Under New Mexico law, "any kind of willful, deliberate and premeditated killing" constitutes first-degree murder. NMSA 1978, § 30-2-1(A)(1) (1994). The State may prove deliberate intent using circumstantial evidence alone. *See Flores*, 2010-NMSC-002, ¶ 19. The jury usually must infer deliberate intent "from other facts in the case." *Id.*

9

(internal quotation marks and citation omitted). The district court in this case gave the jury the following uniform jury instruction on willful and deliberate murder:

> A deliberate intention refers to the state of mind of the defendant. A deliberate intention may be inferred from all of the facts and circumstances of the killing. The word deliberate means arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action. A calculated judgment and decision may be arrived at in a short period of time. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill. To constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice.

UJI 14-201.

{24} The State presented an abundance of evidence in this case from which the jury could have found that Defendant possessed a deliberate intention to kill. First, the jury could have inferred deliberate intent from witness testimony that Defendant displayed a gun at Adan and Colleen's house before driving to Victim's home, calling Victim outside, and shooting him. *See State v. Salazar*, 1997-NMSC-044, ¶ 46, 123 N.M. 778, 945 P.2d 996 (discussing the facts that defendant pursued the victim, pointed the gun, and shot the victim, together constituted direct evidence of deliberate intention).

{25} Additionally, witness testimony established that, after Victim voluntarily went outside and engaged Defendant in conversation, Defendant suddenly reached across the driver and shot Victim at point-blank range. Defendant then shot Victim again

10

after he turned and tried to escape. The physical evidence of Victim's wounds indicated that Victim was shot once in the abdomen at close range and again in the back from farther away, consistent with the State's theory that Victim was shot from behind as he ran, hunched over, away from his attacker. A reasonable jury could have found deliberate intent from these facts. *See State v. Guerra*, 2012-NMSC-027, ¶ 29, 284 P.3d 1076 (explaining that continuing an attack on a defenseless victim demonstrates deliberate intent); *State v. Riley*, 2010-NMSC-005, ¶ 20, 147 N.M. 557, 226 P.3d 656 (holding that a reasonable jury could find deliberate intent where the defendant fired two shots from less than four inches from the victim's body, then shot the victim again as he was trying to escape), *overruled on other grounds by State v. Montoya*, 2013-NMSC-020, ¶ 2, 306 P.3d 426; *State v. Garcia*, 1980-NMSC-141, ¶ 4, 95 N.M. 260, 620 P.2d 1285 (concluding that the jury's finding of deliberate intent was reasonable where the defendant was the aggressor and the victim tried to run away before the fatal shot).

**{26}** Additionally, the jury could have inferred deliberate intent from Defendant's demeanor and conduct after the killing. Defendant's appearance after the killing scared Tammy so much that she reached out to co-workers and asked a friend to pray for her. Then, Defendant left Las Vegas and drove south at speeds of up to ninety miles per hour while being followed by police. From these facts, a reasonable jury

11

could have found that Defendant fled the scene of the crime and attempted to evade the police, an inference that Defendant tried to rebut through his sister's testimony that Defendant was always welcome at her house, regardless of the time of day. *See Flores*, 2010-NMSC-002, ¶¶ 22-23 (explaining that fleeing the scene and trying to evade authorities indicate a consciousness of guilt from which a jury may infer deliberate intent).

{27}     The statements Defendant made while incarcerated awaiting trial provided additional evidence of Defendant's lack of remorse and consciousness of guilt. Defendant bragged to Victim's brother about committing the crime, asking, "Did you see how I put the hole in your [brother]?" *See Guerra*, 2012-NMSC-027, ¶ 29 (concluding that the jury could have inferred deliberate intent from defendant's lack of remorse for the killing); *State v. Roper*, 2001-NMCA-093, ¶ 9, 131 N.M. 189, 34 P.3d 133 (explaining that bragging about the killing evidenced the defendant's guilt). Then, three weeks before the May 31, 2011, trial setting, Defendant instructed the State's witness Colleen to "be down" on the day of trial, ostensibly encouraging her to refrain from saying anything that might hurt Defendant's case.

{28}     Based on the totality of the evidence presented at trial, including the physical evidence and Defendant's conduct before, during, and after the shooting, we conclude that a reasonable jury could have found that the State proved the elements of first-

degree murder beyond a reasonable doubt, including the element of deliberate intent, and we affirm Defendant's first-degree murder conviction.

## 2. Defendant's Tampering With Evidence Conviction Is Not Supported by Sufficient Evidence and Must Be Vacated

**{29}** Defendant argues that the evidence at trial was insufficient to support his tampering with evidence conviction. The State concedes that Defendant's tampering with evidence conviction is not supported by sufficient evidence and should be vacated. Although we need not accept the State's concession as conclusive, *see Guerra*, 2012-NMSC-027, ¶ 9, we agree for the reasons that follow.

**{30}** In order for the jury to convict Defendant of tampering with evidence, the State had to prove beyond a reasonable doubt that Defendant (1) "hid the gun"; (2) with the intention of preventing his "apprehension, prosecution, or conviction"; (3) on or about September 25, 2009. *See* NMSA 1978, § 30-22-5(A) (2003); UJI 14-2241 NMRA. To meet this burden of proof, the State cannot merely ask "the jury to infer that an overt, intentional act of hiding the weapon [has] taken place based solely on the fact that the police never found the weapon." *Guerra*, 2012-NMSC-027 ¶ 16; *see also State v. Silva*, 2008-NMSC-051, ¶ 19, 144 N.M. 815, 192 P.3d 1192 (rejecting the State's argument that the defendant's "possession of a gun and the police's inability to find the gun used in the murder constitutes sufficient evidence of [the defendant's]

13

tampering"); *Duran*, 2006-NMSC-035, ¶ 15 (reversing a tampering conviction because the State asked the jury "to speculate that an overt act of destroying or hiding the knife and possibly blood stained clothing had taken place, based solely on the fact that such evidence was never found"). "[A]bsent either direct evidence of a defendant's specific intent to tamper or evidence from which the factfinder may infer such intent, the evidence cannot support a tampering conviction." *Guerra*, 2012-NMSC-027, ¶ 14 (internal quotation marks and citation omitted).

{31}     In this case, as in *Guerra*, *Silva*, and *Duran*, police never recovered the murder weapon. Other than the fact that the gun Defendant used to shoot Victim was never located, the State presented no direct or circumstantial evidence from which the jury could have found that Defendant hid the gun with the specific intent to prevent his apprehension, prosecution, or conviction. Accordingly, we conclude that the evidence at trial was insufficient as a matter of law to support Defendant's tampering with evidence conviction and hold that the conviction must be vacated.

**B.     Alleged Jury Contamination**

{32}     Defendant asserts that two instances of jury contamination deprived him of the right to a fair and impartial jury. *See State v. Sanchez*, 1954-NMSC-010, ¶ 14, 58 N.M. 77, 265 P.2d 684 ("[T]he right to trial by a fair and impartial jury is a fundamental right of the accused."). More specifically, Defendant contends that the

14

district court erred by denying his motion for a mistrial and that, at a minimum, the district court should have conducted individual voir dire of the jurors following two situations that arose during the course of trial.

{33} The State argues that the district court responded appropriately to both alleged instances of jury contamination by giving the jury curative instructions. A district court has "considerable discretion and a variety of remedies to address allegations of juror bias, including individual voir dire, curative instructions, and if necessary dismissal of an affected juror for cause." *State v. Gallegos*, 2009-NMSC-017, ¶ 29, 146 N.M. 88, 206 P.3d 993. A mistrial is an extreme remedy, *State v. Allison*, 2000-NMSC-027, ¶ 23, 129 N.M. 566, 11 P.3d 141, and "[c]ourts rarely grant a motion for mistrial based on mere equivocal evidence of possible juror bias or prejudice, even with the potential to negatively impact a trial." *Gallegos*, 2009-NMSC-017, ¶ 28.

{34} On appeal, we consider whether the district court abused its discretion when it declined either to declare a mistrial or to conduct individual voir dire of the jurors and whether the instances of alleged juror contamination "unfairly affected the jury's deliberative process." *See Montoya*, 2013-NMSC-020, ¶ 62 (internal quotation marks and citation omitted); *see also State v. Swick*, 2012-NMSC-018, ¶ 68, 279 P.3d 747 (stating that the district court's denial of a mistrial is reviewed for abuse of discretion); *Gallegos*, 2009-NMSC-017, ¶ 24 (recognizing that the district court's discretion to

15

conduct individual voir dire in instances of alleged juror bias is "limited only by the essential demands of fairness" (internal quotation marks and citation omitted)).

***1.   The District Court Did Not Abuse Its Discretion When It Denied Defendant's Motion for a Mistrial and Declined to Voir Dire a Juror After the Juror May Have Seen Defendant in Shackles***

**{35}**   Defendant asks this Court to grant him a new trial because one juror "possibly saw" Defendant in prisoner restraints as he was boarding a transport van after the court had recessed for the day on November 30, 2011. Defense counsel learned about this incident the next day and brought it to the attention of the district court.

**{36}**   After defense counsel raised the issue, the officer who had transported Defendant explained to the district court what had happened. Before allowing Defendant to board the transport van, the officer had shackled Defendant, then checked the video monitors and looked around to ensure that no one was present. Having seen no one, the officer opened the doors to van. However, as Defendant was climbing into the van, one of the jurors came around the corner and walked between the van and the building. The juror was alone and talking on her cell phone when she walked by. The juror nodded to the officer as she passed. The officer was not sure whether the juror had seen Defendant.

**{37}**   After the district court heard the transport officer's account of the incident, Defendant moved for a mistrial, arguing that the juror's observation of Defendant in

16

shackles was per se prejudicial and would constitute reversible error on appeal. The court denied Defendant's motion on the ground that the jury already had heard evidence demonstrating that Defendant was incarcerated, including testimony from three witnesses who had spoken with Defendant while he was incarcerated awaiting trial. Without referencing the incident, the trial court reminded the jurors of their obligation to leave the court immediately after being excused for the day in order to avoid inappropriate interactions with the parties.

**{38}** On appeal, Defendant contends that the district court erred by not granting a mistrial and that, even if a mistrial was not the appropriate remedy, the district court should have asked the juror what she had seen and whether it had affected her impartiality.

**{39}** Generally, "a prisoner coming into court for trial is entitled to make his appearance free of shackles or bonds." *State v. Holly*, 2009-NMSC-004, ¶ 41, 145 N.M. 513, 201 P.3d 844 (internal quotation marks and citation omitted); *see also* Rule 5-115(C) NMRA ("Except by order of the court, the defendant may not appear before the jury in any visible restraint devices, including handcuffs, chains or stun belts, a visible bullet proof vest or any other item which, if visible to the jury, would prejudice the defendant in the eyes of the jury."). However, a defendant's right to appear free of visible restraints is not absolute. *State v. Johnson*, 2010-NMSC-016, ¶ 26, 148

N.M. 50, 229 P.3d 523. It must be balanced against the state's interest in maintaining security. *State v. Gomez*, 1971-NMCA-009, ¶¶ 2-7, 82 N.M. 333, 481 P.2d 412 (upholding the district court's denial of mistrial where jurors had viewed the defendant in handcuffs only as safety requirements demanded, "prior to the beginning of trial and during recess"). In this case, the transport officer shackled Defendant for the purpose of transporting him to the detention facility and carefully checked the area to ensure that no one was present before allowing Defendant to board the transport van, striking a reasonable balance between safety concerns and the need to prevent any jurors from seeing Defendant.

{40} Moreover, this Court has held that a juror's "inadvertent or insignificant exposure to a defendant in shackles is not sufficiently prejudicial to merit a new trial." *See Holly*, 2009-NMSC-004, ¶ 41. In *Holly*, a situation arose at trial that was similar to the incident in this case. "On the evening of the first day of trial, one member of the jury *may* have seen [the defendant] in handcuffs as he was escorted back to the detention facility." *Id.* ¶ 40 (emphasis added). Rather than calling attention to the incident by questioning the jurors, the district court chose to remedy the situation by repeating the general jury instructions to the jurors. *Id.* On appeal, this Court concluded that the incident did not constitute fundamental error because "it [was] unclear whether any exposure actually occurred, or if it did, that it was anything more

18

than inadvertent or insignificant exposure." *Id.* ¶ 42 (internal quotation marks and citation omitted).

{41} Additionally, New Mexico cases have held that the potential for prejudice caused by a juror's inadvertent exposure to a defendant in restraints is minimal when the evidence at trial has shown that the defendant is incarcerated. For example, in *State v. Mills*, 1980-NMCA-005, ¶ 15, 94 N.M. 17, 606 P.2d 1111, at least one juror viewed the defendant in handcuffs while a bailiff was escorting the defendant from the courtroom during a noon recess. The defendant moved for a mistrial, arguing that the incident deprived him of a fair trial. *Id.* The bailiff explained to the district court that he had waited with the defendant "for the time normally required for the departure of jurors," and "that the view occurred because some jurors had used the restroom before departing." *Id.* ¶ 16. The district court ruled that the juror's observation of defendant in handcuffs was inadvertent and denied the defendant's motion for a mistrial, reasoning that "any impropriety resulting from the view was harmless" because the evidence at trial showed that the defendant was incarcerated. *Id.* ¶¶ 16-17. The Court of Appeals affirmed the district court. *Id.* ¶ 17.

{42} In this case, as in *Holly*, it is not clear whether the juror even noticed Defendant as she passed by the transport van while talking on her cell phone. To the extent that the juror may have seen Defendant, any exposure was inadvertent and occurred

19

outside the courtroom. And, as in *Mills*, the jury had already heard evidence at trial indicating that Defendant was incarcerated. We conclude that the district court acted within its discretion when it chose to repeat the general jury instructions to the jury, rather than calling additional attention to the incident by questioning the juror, and we hold that the district court did not abuse its discretion by denying Defendant's motion for a mistrial.

***2.*** ***The District Court Did Not Abuse Its Discretion When It Denied Defendant's Request to Question the Jurors Regarding an Unsolicited Remark Made by a Witness After Leaving the Witness Stand***

{43}     At trial on December 1, 2011, defense counsel informed the district court that a witness had made an audible comment while passing by the jury box after leaving the witness stand the previous day. The record reflects three different versions of the witness's remark: (1) Defendant thought the witness said, "They killed my family"; (2) the bailiff thought the witness said something about needing to get back to his family; and (3) the district judge thought he heard the witness say, "Why would they do that to my family?"

{44}     To remedy the situation, defense counsel asked the court to question the jurors to determine what, if anything, they had heard. Instead, to avoid drawing unnecessary attention to anything the witness had said, the district court denied Defendant's request and instructed the jurors to disregard anything the witness said after leaving

20

the witness stand.

{45} We conclude that the district court's curative instruction to the jury was a proper, adequate remedy under the circumstances. As explained above, the district court has wide discretion to determine how best to address instances of potential juror contamination. *See Gallegos*, 2009-NMSC-017, ¶ 29. When determining which course of action to take, a district court may distinguish "between inadvertent remarks made by a witness . . . and similar testimony intentionally elicited by the prosecutor." *State v. Fry*, 2006-NMSC-001, ¶ 53, 138 N.M. 700, 126 P.3d 516 (internal quotation marks and citation omitted). Where a witness had made an unsolicited remark, the district court can cure any prejudicial effect by giving the jury a curative instruction. *Id.*; *see also Callaway v. State*, 1990-NMSC-010, ¶¶ 5, 8, 109 N.M. 416, 785 P.2d 1035 (explaining that the district court should have admonished the jury to disregard a witness's unsolicited statement, rather than declaring a mistrial).

{46} The witness's remark in this case was neither solicited by the parties nor inherently prejudicial. We hold that the district court did not abuse its discretion when it declined to question the jurors and instead instructed the jury to disregard anything the witness said after leaving the witness stand.

**C. Admission of Victim's Statement Identifying Defendant as the Shooter**

{47} Defendant asserts that Victim's statement identifying Defendant as the shooter

21

was inadmissible hearsay and argues that the district court erred by allowing Amy to testify about the statement at trial. Defendant filed a pretrial motion in May 2011 seeking to preclude the admission of the statement, but the district court denied the motion and permitted the testimony at trial.

**{48}**　"Hearsay consists of an out-of-court statement offered to prove the truth of the matter asserted, and is inadmissible as substantive evidence unless it falls within an exclusion or exception to the hearsay rule." *State v. Largo*, 2012-NMSC-015, ¶ 24, 278 P.3d 532 (internal quotation marks and citation omitted); *accord* Rule 11-801(C) NMRA. "We review the admission of evidence pursuant to an exception or an exclusion to the hearsay rule under an abuse of discretion standard by which deference is given to the district court's ruling." *Largo*, 2012-NMSC-015, ¶ 22.

*1.　Victim's Statement Was Admissible Under the Dying Declaration Exception to the Hearsay Rule*

**{49}**　The State argues that Victim's out-of-court statement identifying Defendant as the shooter was admissible as a dying declaration under Rule 11-804(B)(2) NMRA. Under Rule 11-804(B)(2), a declarant's statement made while "under the belief of imminent death" regarding the "cause or circumstances" of the declarant's death is admissible "if the declarant is unavailable as a witness." The party seeking to introduce a statement as a dying declaration must show "that the declarant made the

22

statement while conscious and under the realization that death was approaching." *Largo*, 2012-NMSC-015, ¶ 26.

**{50}** Defendant argues that the facts do not support a finding that Victim believed his death was imminent at the time Victim made the statement. We disagree. "[I]f it can reasonably be inferred from the state of the wound or the state of the illness that the dying person was aware of his [or her] danger, then the requirement of impending death is met." *Id.* (second alternation in original) (internal quotation marks and citation omitted). In this case, Victim ran into the house immediately after being shot twice and cried out, "Babe, help me please. Help me babe. Louie just shot me." After speaking these words, Victim stopped talking, collapsed on the floor, and stopped breathing. Within about twenty minutes, hospital personnel reported Victim's death to law enforcement. Under these circumstances, we conclude that the district court did not abuse its discretion by finding that Victim was aware of his imminent death, and we hold that Victim's statement was admissible as a dying declaration.

***2. Victim's Statement Was Admissible Under the Excited Utterance Exception to the Hearsay Rule***

**{51}** The State argues that Victim's statement regarding the identity of his attacker was also admissible under the excited utterance exception to the hearsay rule. An excited utterance is "[a] statement relating to a startling event or condition, made

23

while the declarant was under the stress or excitement that it caused." Rule 11-803(2) NMRA. "[I]n order to constitute an excited utterance, the declaration should be spontaneous, made before there is time for fabrication, and made under the stress of the moment." *State v. Macias*, 2009-NMSC-028, ¶ 31, 146 N.M. 378, 210 P.3d 804 (internal quotation marks and citation omitted), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. When considering whether a statement constitutes an excited utterance under Rule 11-803(2), this Court considers

> the totality of the circumstances, including how much time passed between the startling event and the statement, and whether, in that time, the declarant had an opportunity for reflection and fabrication; how much pain, confusion, nervousness, or emotional strife the declarant was experiencing at the time of the statement; whether the statement was self-serving[; and whether the statement was] made in response to an inquiry.

*Flores*, 2010-NMSC-002, ¶ 49 (alteration in original) (internal quotation marks and citation omitted).

{52} In this case, Victim voluntarily went outside to talk to his "primo, Louie" and was engaging Defendant in conversation when Defendant suddenly shot him twice, causing fatal injuries. Victim identified Defendant as the shooter immediately after this startling event, without time for reflection or fabrication. Given the gravity of Victim's wounds, Victim probably was experiencing pain and confusion when he made the statement. We conclude based on the totality of the circumstances that

24

Victim's statement was admissible under the excited utterance exception to the hearsay rule, in addition to the dying declaration exception to the hearsay rule, and we hold that the district court did not abuse its discretion by admitting the statement.

**III.   CONCLUSION**

**{53}**   We conclude that sufficient evidence supports Defendant's conviction for first-degree murder, and we affirm that conviction. However, the State failed as a matter of law to present sufficient evidence to support Defendant's conviction for tampering with evidence, and accordingly, we remand to the district court to vacate that conviction. We reject Defendant's remaining arguments, regarding alleged jury contamination and the admission of evidence, as devoid of merit.

**{54}**   **IT IS SO ORDERED.**

_____
**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**

25

_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**

26